JANVIER, Judge.
This is the second attempt by Mrs. Estelle Rodi Soulet, widow of Theophile Soulet, to compel the City of New Orleans through its Bureau of Vital Statistics to change its registration of the death of her father, Steve Rodi, (sometimes referred to in this transcript as Steve Jr. and sometimes as Steve II) who died in New Orleans on February 19, 1953, so as to have that record show that her said father was a white man and not a Negro.
The result of the first attempt of relatrix to force this change may be ascertained by reading our decision in that matter. *110 See State ex rel. Rodi v. City of New Orleans, La.App., 78 So.2d 855.
When Steve Rodi, Jr., the father of relatrix died, a death certificate was issued by the attending physician. In this certificate the race of Steve Rodi, Jr., was set forth as white. The undertaker who buried Rodi says that he does not perform such services for Negroes, The officials of the cemetery in which the body was. interred do not knowingly accept for interment bodies of Negroes. When the registration of Rodi’s death was made in the records of the Bureau of Vital Statistics in the City of New Orleans, the information given came from Patrick Den-ease, a member of the Rodi family, and, according to this information, the said Rodi was white. Accordingly, the death was registered as the death of a white man.
Several months later when some member of the Rodi family desired a copy of that death certificate, the officials in charge of the Bureau of Vital Statistics being familiar with the name Rodi, obtained evidence which .convinced them that Rodi was in fact a Negro and not white and, acting on that evidence, which they thought' conclusive, those official's changed the registration of the death of Rodi so as to show his race as colored. It was then that the relatrix brought her first mandamus proceeding to compel the City to delete this change in. the registration of the race of her father and to restore the original entry so as to show his race as white. In that first proceeding the' relatrix did not allege that her father had been a white man. She based her suit solely on the contention that the Bureau, having once made such an entry in its records, could not change that entry except after a judgment of a competent court ordering the change.
To that first petition the City filed an exception of no cause of action maintaining that unless the relatrix would allege that her father had actually been white, she could not force the City to change its records so as to show his race as white. The contention of the relatrix in that first proceeding, that the City did not have the legal right to make the change which it had made, was based on the fact that in an earlier case, Sunseri v. Cassagne, 195 La. 19, 196 So. 7, 8, the Supreme Court of Louisiana had said that such officials could not change entries once made, except upon judgment of a competent court. The Court said:
“ * * * The officer did not have the right to change or alter the certificates even though the information upon which he relied was correct. * * * »
At that time the applicable statute was Act 257 of 1918 which provides that:
“no certificate of birth or death, after its acceptance for registration by- the Local Registrar, and no other record made in pursuance of this Act, shall be altered, or changed in any respect otherwise than by judgment of court of competent jurisdiction.”
As we showed in our descision in that first proceeding, counsel for relatrix did not then know that after the decision in the Sunseri case the Legislature, in 1942, had enacted Act 181 which, in section 1, provides that such a change may be made on receipt of “sufficient documentary and/or sworn evidence acceptable as a basis of such change or alteration.”
In that first mandamus proceeding counsel for relatrix, not being aware of the act of 1942, LSA-R.S. 40:266, did not attack its constitutionality. This they do in the present suit, contending that the statute of 1942 is unconstitutional for three reasons: (1) That the statute is in violation of the Due Process clauses of the United States Constitution and of the Constitution of Louisiana of 1921; (2) That it is in violation of the Equal Protection clause of the Fourteenth Amendment of the United States Constitution; and (3) That it is an unconstitutional delegation of legislative authority.
*111 Counsel for relatrix thus contend that, since the act is unconstitutional, there was no authority for the making of the change which was made by the registrar in this case and, in the alternative, that even if the statute is constitutional and does authorize such a change where the evidence justifies it, the evidence here shows that, as a matter of fact, Steve Rodi, Jr., the father of relatrix, was white and that, accordingly, the altered record should foe corrected so as to show that fact.
Relatrix attacks the statute of 1942,— which.we may say has now been amended by Act 237 of 1950 which amendment, however, does not affect in any way the matter which is before us,' — on three grounds: (1) That if it permits that such a change as was made here may be made without notice, it in effect denies to those at interest and particularly to relatrix here due process of law as guaranteed by both the Constitution of the United States and the Constitution of 1921 of the State of Louisiana; (2) That it is an unconstitutional delegation of legislative authority to a purely administrative body; and (3)' That it denies to those at interest the equal protection of the law.
The contention that the statute is an unconstitutional delegation of legislative authority is easily disposed of. If the statute authorized the registrar to make decisions as to what might or might not be best, then it would constitute an unconstitutional delegation of legislative authority, but the statute does not do that. It merely authorizes the registrar to reach a decision on questions of fact after securing evidence. Where a statute attempts to delegate authority to make fundamental decisions on what is best for the public welfare and there are no standards or uniform requirements, then there is an unconstitutional delegation. But where such a statute merely authorizes a registrar or a board to reach a conclusion on facts, that is not a delegation of legislative authority.
The distinction between unconstitutional delegation of legislative authority and the completely constitutional delegation of authority to determine facts and to enforce laws in accordance with those facts is set forth in American Jurisprudence, Volume 11, Constitutional Law, section 242, page 960:
“There are no constitutional objections arising out of the doctrine of the separation of the powers of government to the creation of administrative boards empowered within certain limits to adopt rules and regulations and authorized to see that the legislative will expressed in statutory form is carried out by the persons or corporations over whom such board may be given administrative power. Boards and commissions of this character do not exercise any of the powers delegated to the legislature. They do not make any laws. They merely find the existence of certain facts, and to these findings of fact the law enacted by the legislature is applied and enforced.”
In 16 C.J.S., Constitutional Law, § 133, p. 558, it is stated that:
“ * * * the legislature may make a law to delegate a power to determine some facts or state of things on which the law makes or intends to make its own action depend.”
Our conclusion is that the statute does not effect an unconstitutional delegation of legislative authority.
The contention that the statute denies to the relatrix or to other persons at interest the equal protection of the laws is without foundation. The statute operates in all cases where the evidence justifies action and is not limited to any particular case or to any particular person or to persons of any particular race. In City of New Orleans v. Pergament, 198 La. 852, 5 So.2d 129, 131, which was a Zoning case, the Supreme Court held that there is no de *112 nial of equal protection where a statute provides regulations “which all persons similarly situated should he obliged to comply with.”
The contention that the statute effects a denial of due process of law is not so easily disposed of. In support of this contention counsel for relatrix argues that if the statute is constitutional it would, in effect, give to a registrar the right to annul a marriage, and thus to destroy a community of acquets and gains which might have resulted from the marriage; that the persons interested have a property right in maintaining that marriage and in maintaining the community of acquets and gains, and that this right cannot be destroyed by the action of an administrative officer such as a registrar and, particularly, that this may not be done without notice and without a hearing.
Where there is no legal marriage because of the fact that one of the parties is a Negro and the other white and thus the marriage, because of our miscegnation laws, is an absolute nullity then the so-called marriage, from the time it was performed, was an absolute nullity and the parties are not deprived of any substantive rights by the action of the registrar.
Often an administrative officer or body may make decisions on facts without notice to interested parties. To do so does not result in a denial of due process for there always exists the right of appeal to the courts to set aside any such change as was effected here.
In 16A C.J.S., Constitutional Law, § 628, p. 849, in a Headnote, appears the following:
“Due process of law may be afforded by administrative as well as by judicial proceedings. While the requirements of due process of law ordinarily apply to administrative proceedings, there is - no denial of due process if notice and hearing are dispensed with in connection with purely preliminary matters, and the right to judicial review, where reserved, may cure any lack of due process in the original administrative proceedings,”
Also, in American Jurisprudence, Volume 11, section 242, page 962, appears the following:
“ * * * administrative boards need not be required to act on sworn evidence, nor are they bound to act only after a hearing or to give a hearing to those asking for one. * * * ”
This is especially true where the paramount public interest is involved.
We find interesting two statements in 16A C.J.S., Constitutional Law, § 602, one appearing at page 712 and reading as follows :
“It is not every interference with property rights that constitutes a deprivation of property without due process. While the general rule is that property rights shall be free of government interference, as discussed supra § 599, those rights are not absolute, since the rights of property are necessarily relative to those held by others under the same constitutional sanction; and equally fundamental with the private right is that of the public to regulate it in the common interest, for the protection of the safety, health, morals, or general welfare of the community, any loss resulting from such regulation being merely consequential.”
The other statement which we find interesting is found in § 628, on page 851, reading as follows:
“ * * * Procedural due process in administrative law is generally recognized to be a matter of greater flexibility than when dealing with strictly judicial tribunals, * * *.”
In the same volume and section of C. J. S., ■ at page 857, appears the following:
“Where there is due provision for appeal to a judicial tribunal, no notice *113 or hearng before the administrative tribunal is essential to due process. So if a hearing is not included in the administrative process it may be adequately supplied by a judicial proceeding in which new evidence may be supplied and full opportunity afforded for exploration of the basis of the disputed administrative order. * * ”
While it is true that, in the statute with which we are concerned, there is no express provision for appeal to the courts, it has always been recognized that the parties interested in such a situation may, by mandamus, attempt to have records corrected in accordance with the true facts. Unfortunately, in this state there have been many such cases, notably, Sunseri v. Cassagne, supra, State ex rel. Treadaway v. Louisiana State Board of Health, La. App., 56 So.2d 249, and Green v. City of New Orleans, La.App., 88 So.2d 76.
The complete impracticability of requiring notice and a hearing in such cases is made apparent by the facts which are found here where it is shown that almost innumerable persons will be affected. What members of the family must be notified? What members must be present at a hearing? After the second or third generation innumerable children, grandchildren and great grandchildren may be interested. It would be completely impracticable to hold that a correction could not be made in the public record unless a notice and opportunity to be heard had been given to each person who, as a blood descendant, might be interested in the matter.
Our conclusion is that the statute in question does not effect a denial of due process of law and our conclusion on the whole question of constitutionality is that the statute is not unconstitutional.
When we come to consider the facts we find a controversy over the question of who should be required to prove the correctness or incorrectness of the record and just how much proof should be required.
On behalf of relatrix it is argued that we should first decide whether the Bureau was justified by the evidence which it obtained in making the change from white to colored and that until the Bureau has convinced the Court that it had sufficient evidence to make that change the relatrix is not called upon to prove that the change which was then made should be deleted and that the registration of the race of Rodi, Jr., as white should be reinstated.
Our attention is directed to the fact that in Sunseri v. Cassagne, supra, the Supreme Court laid down a rule that a change in such a registration should not be made unless the proof is so overwhelming as to justify the conclusion that there is practically no doubt at all. In other words, that neither a preponderance of evidence nor even proof beyond a reasonable doubt is sufficient to warrant such a change; that there must be such proof as will almost justify the conclusion that there is no doubt at all.
In the Sunseri case the Supreme Court said that the marriage of defendant which was attacked on the ground that she was a Negress “should not be annulled * * * unless [all] the evidence adduced leaves no room for doubt that such is the case.”
Following this, in State ex rel. Treadaway v. Louisiana State Board of Health, supra, [56 So.2d 250] we referred to the decision of the Supreme Court and said: “We feel that the language used by the Supreme Court means that there must be no doubt at all.”
It is conceded by counsel for the City that, before the act of 1942, such proof was necessary, but that, as a result of that act, the registrar, when he feels that there has been an error in such registration and obtains satisfactory evidence as to the correct race of the person on whom the registration is based, it may, on such evidence, make such change as is thereby justified, *114 but that if a third person attempts to force the Bureau to make such a change, the proof produced must, as was held by the Supreme Court in the Sunseri case, and by us in the Treadaway case, be so convincing as to leave practically no doubt at all.
We feel that the City is correct and that, having obtained evidence which left no reasonable doubt in the minds of the officials as to the race of Rodi, Jr., it was justified in making the change which it made, and that it cannot be forced to make the alteration demanded by relatrix when the evidence leaves no room for doubt.
Let us consider what evidence was produced. The relatrix is the daughter of Steve Rodi, Jr., who, as stated, is sometimes referred to as Steve Rodi, II. He was the son of Steve Rodi, Sr., and Her-bertine or Huberine Dennise. It is conceded by the City that Steve Rodi, Sr., was white and it follows that unless the mother, Huberine Dennise, was colored, then relatrix is correct and the race of her deceased father, Steve Rodi, Jr., should be shown as white, for if it is shown conclusively that both parents of a person are of the white or Caucasian race then the inescapable conclusion is that that person is also white.
As already stated, the doctor who attended Rodi in his last illness and the undertaker who interred his remains, and the sexton of the cemetery all stated that they thought he was white, but no one of these persons knew the family at all. In addition to these witnesses, several members of the Rodi family testified that both the father, Steve Rodi, Sr., and the mother, Herbertine or Huberine Dennise, were white. However, insofar as Huberine Dennise is concerned there is annihilating testimony to the contrary.
Dr. J. T. Reeves, the Coroner of Plaque-mines Parish in which Rodi lived practically all of his life, stated that he was well acquainted with the Rodi family, that the members of that family were his patients, that they always used his colored waiting room and never attempted to use the white waiting room and that he had no doubt at all that they were colored. Dr. Reeves says that he knew Frank or Francois Rodi who was generally known to be a brother of Steve Rodi, Jr., and that at Frank’s death he, Dr. Reeves, executed the death certificate, and in the presence of Frank’s wife stated in the certificate that Frank was colored.
Some members of the Rodi family stated that they did not know who Frank Rodi was; that he was'not a brother of Steve Rodi, Jr., and they attempted to create the impression that Frank was probably an illegitimate son of Herbertine or Huberine Dennise by a colored father and not by Steve Rodi, Sr. However, the death certificate of Frank Rodi shows him to be colored and also shows that he was the son of Steve Rodi and Herbertine Dennis. If so, then he was the brother of Steve Rodi, Jr., and except for the testimony to which we have already referred, there is nothing in this record to show the contrary.
John C. deArmas, the Parish Engineer, says he was familiar with the Rodi family, all of whom lived near Buras; that he knew Steve’s mother and that she was a Negress and that Steve Rodi, Jr., was himself a Negro. He says none of the family claimed to be white and that their associates were always Negroes.
Among many of the vital statistics records offered in evidence are several which are most revealing. One shows the registration of the birth of a daughter, Huberine Ida Denise, to the parents, Francoise Mal-donata- Desmolle and Francois Rodi who, as the evidence seems to indicate, was a brother of Steve Rodi, and this certificate shows that the mother and the father were both colored. The midwife who assisted at this birth was Mrs. Francois Desmolle and the similarity of the names, both the given and the family name, indicate that, *115 as other evidence shows, she was a member of the same family.
Another of these certificates shows the birth of a son, Albert Rodi, to Stephen Rodi and Henriette Demolle. The race of this child is not given but the race of both parents is given as colored and the midwife who registered the birth was Mrs. Lacoste Sylve.
Another certificate shows the birth of a daughter, Martha Rodi, to Stephen Rodi and Henriette Demolle, and here again the race of both parents is given as colored. Here again the midwife was Mrs. Lacoste Sylve.
Still another certificate shows the birth of a daughter, Etta Rodi, to Stephen Rodi and Henriette Demolle and again the certificate shows the race of the parents as colored and again the midwife was Mrs. Lacoste Sylve.
Mrs. Bettha North, another midwife of the Parish, said that she knew Steve Rodi, Jr. and that he was a Negro, and she said that the two midwives who had registered the births of the several children just mentioned were both colored and were both members of the Rodi family, and, as already stated, that seems to be indicated by the similarity of the names of one of the midwives, Mrs. Francois Desmolle.
Mrs. North stated that more than fifty years before she had known Huberine Dennesse and that she knew she was colored “because she said so.” This statement is attacked by counsel for relatrix who say that it is inconceivable that Mrs. North could have remembered such a statement for more than fifty years.
The fact that the two midwives were members of the family of the deceased husband of the relatrix and that they, in giving the information on which these certificates were prepared, stated that Steve Rodi was colored weighs heavily against the contention of relatrix.
Another witness who said that he had been a lifelong resident of the Parish, that he lived near the Rodi family, and that the brothers, Francois and Steve Rodi, Jr., were colored was Steve Mistich, and when asked “what color were they?” he' answered: “They were supposed to be negro on the mother’s side * * *.” He said that the Rodi children, Frank and Steve, and the sisters did not go to the places to which white people went.
The relatrix places great reliance on the fact that among the census records of the United States there are some which were made in 1850, in 1860 and in 1880 and that on these records are shown the names of various families which are in the background of the Rodi family and that nowhere in those records is it shown that any of them were colored. The names referred to are Rodi, Roddi, Demolle and Dennese. On these records there are columns for the entering of the race of the persons listed. On some of them, after each name appears the letter W, obviously meaning white, and in some there is no entry at all. In referring to the fact that he did not place too much reliance on those records for the purpose of determining the issue presented here, the District Judge very properly said:
“The Census report is nothing more than a record of information given by the subject interrogated to the Census taker for statistical purposes; the latter is not an investigator, and must accept information as given unless it is obviously, or personally known to him, to be incorrect. The subject being interviewed could be of negro blood, yet look Caucasian. These Census Exhibits are part of the whole picture, but are not conclusive in themselves.”
Mrs. Naomi M. Drake, Deputy Registrar of the Board of Health of the City and Recorder of the Bureau of Vital Statistics, stated that when it came to the attention of the Bureau that the record of thé death of Steve Rodi showed him to be white, the officials were surprised because *116 they kept what is called a “flag' list” of certain families known to be colored, but who sometimes erroneously claimed to be white, and that on this list were the names De-Molle, Silve or Sylve, Encalade, Rodi and Dennese. She said that thereafter she personally went to Plaquemines Parish where the family of Steve Rodi had lived for years and spent several days making a thorough investigation, and that, as a result of this and because of the various certificates already referred to, the officials were convinced that there was no doubt at all that Steve Rodi whose death was recorded and whose race is involved here was colored. She said: “I made these trips to Pointe-a-la-Hache and I checked various records. I interviewed numerous people, some of whom did not want to be called as witnesses and some who volunteered to come as witnesses on another case.” She said that not only was it determined that Steve Rodi, Jr., should have been registered as colored but that obviously there had been an effort to confuse the issue by stating on the certificate that his wife was Henrietta Maxion whereas, as a matter of fact, his wife was Henrietta Demolle, a member of the Demolle family, which, according to the records of the Bureau, was known to be colored.
Anthony Ciaccio, State Registrar of Vital Statistics, gave testimony quite similar to that of Mrs. Drake. He says that he knew “pretty much all of the names of the negro families in the other parishes * * and * * * in the Parish of Orleans.” He said, too, that in the State Bureau there is maintained a “flag list” which seems to be similar to that maintained in the City Bureau and that on that list are the names Rodi, Demolle and Denesse. He said that he, too, made several trips to Pointe-a-la-Hache, interviewed numerous people and became absolutely convinced that Steve Rodi, whose death had been recorded was colored.
As pointed out by the District Judge, the record indicates that Steve Rodi, Sr., the father, and Steve Rodi, Jr., the son, lived in Buras, in Plaquemines Parish, in a settlement known as “Coon Town” and that, as is well known, the word “coon” used in that association is a colloquial expression meaning Negro. The witnesses said that only colored families lived in Coon Town.
Edward Pelas, placed on the stand on behalf of relatrix, said that the name Coon Town was not based on the race of the people who lived there, that that settlement was called Coon Town because many racoons were killed there by hunters.
It is true that it is conceded that the father, Steve Rodi, Sr., was white and from this it necessarily follows that if Steve Rodi, Jr., was colored, the colored blood came from the mother’s side, that is, from Huberine Dennise or Dennease, Denise, or Denis, as the name appears in different records. And it is true that there is some evidence to the effect that the children of Steve Rodi, Sr., were, by some persons, considered as white, for instance, this statement is made by the witness Pelas just referred to. However, the record shows that Pelas had not known the Rodi family for about fifty years.
Our examination of the record leads to the conclusion that there is no doubt at all that the contention of relatrix is not well founded and that her deceased father was actually colored and a more detailed discussion of the - already extensive reference to the evidence would serve no useful purpose.
We fully realize the extreme importance of reaching the proper conclusion on a matter of such supreme importance to those who are involved. We feel that nothing can possibly be of more importance than for a person to be absolutely certain as to his genealogy and particularly as to his race. We know that a white person has an absolute right to be known as white and a colored person has the same right to be known as colored, and we know that in this area nothing can cause greater distress *117 and humiliation to those who believe themselves to be of one race and then to find that they have in their veins blood of another. Therefore, in such cases as this, and unfortunately there have been several, we do not reach a conclusion until we have studied every word in the record and have weighed the testimony most carefully. We have done so here and regret that we can reach but one conclusion, that is, that the Steve Rodi whose death was recorded was in fact of the Negro race. We think that is shown not only beyond a reasonable doubt but to the certainty which should be required in such cases. The District Judge so concluded also, for when, in the hearing on the application for rehearing, he was shown that in his original opinion he had used the words, “by a preponderance of the evidence” he stated that he realized that the proof must leave no doubt and, in his original opinion, inserted the words: ■“beyond any doubt.”
Since we conclude that the evidence leaves no doubt as to the race of Steve Rodi, the result would be the same even if we are in error in our conclusion that the statute of 1942 is constitutional.
Even without that statute, such a Bureau is authorized by a judicial decision to make such a change. That was the exact situation which was presented in the Sun-seri case. There the Bureau in issuing a copy of a certificate made a change to show the race as colored rather than as white and when a mandamus proceeding was brought to attempt to force the Bureau to alter the record so as to show the race as white, the Bureau resisted and produced evidence to show that the change which had been made was correct. The Supreme Court ultimately reached the conclusion that the change was correct. Therefore the decision in that case did not come from a proceeding brought by the Bureau but came as a result of a proceeding brought against the Bureau which is exactly what has been done in this case.
Our conclusion therefore is that even if the Bureau did not have the right to make the change originally, and we think that it did have that right, nevertheless since the change was made and since we conclude that it was properly made, the suit of the relatrix was properly dismissed.
Accordingly, the judgment appealed from is affirmed at the cost of appellant.
Affirmed.