96 So.2d 321

**Succession of Jules LAPENE.**

No. 42858.

June 10, 1957.

See also 230 La. 8, 87 So.2d 710.

Philip P. Spencer, Gaspar R. Bossetta, New Orleans, for defendant-appellant.

Samuel J. Tennant, Jr., Michael H. Bagot, New Orleans, for plaintiffs-appellees.

HAMLIN, Justice-ad-Hoc.

Jules Lapene died testate in the city of New Orleans on April 6, 1889. His last will and testament, dated November 28, 1877 and written in the French Language, was in nuncupative form by public act before Abel Dreyfous, Notary Public. A certified translation of the will reads as follows:

"No. 96        State of Louisiana
                    Parish of Orleans

"28 November 1877    Before Me, Abel Dreyfous, Notary Public for the Parish of Orleans, and the City of New Orleans, therein residing—

Testament of Jules Lapene

"Appeared:—Mr. Jules Lapene, domiciled in the Parish of Terrebonne, in this State.

"And in the presence of Messrs. Miguel Hernandez, Jr., Anthony Prados, Jr. and Alfred H. Peyne, all residing in this City, witnesses called.

"Who being sound of body and mind, dictated to the undersigned Notary, in the presence of the said three witnesses of the testament ——— (this word illegible to translator) which follows, to-wit:—

"My father and mother are dead, I have never been married. I have two natural children Anne and Jules Lapene who are actually to be found at Pau, Department of the Basses Pyrenees in France.

"I give and bequeath to my two said natural children the quarter of all the goods and whatever nature they may be and in whatever line they may be found which I will possess on the day of my death. If one of the two dies before me the part of the defunct will accrue to the surviver.

"I give and bequeath the remainder of my goods to my legitimate brothers and sisters or to their descendants.

"I name for my testamentary executors and detainers of my goods, my friends Oscar Bois and Leon Queyrouz, of this City, to act together or separately, as they might please.

"I revoke all testaments made by me anterior to this one.

"This testament was thus dictated by the testator to the undersigned Notary who wrote it, in its entirety, of his hand as it was dictated to him and read it to the testator who declared understanding it well and perservering therein, the whole in the presence of the said three witnesses.

"Done and passed in the office, at once, without interruption and without diversion to other acts, the twenty-eighth of November One thousand eight hundred seventy-seven. And after reading the whole by the Notary to the Notary to the testator, in the presence of the said witnesses, the testator signed with the witnesses and the Notary.

"(signed) Jules Lapene
            M. Hernandez, Jr.
            A. Prados, Jr.
            A. H. Payne
            Abel Dreyfous
            Not. Pub.

"Translation From The French Language Certified Correct.
/s/ Chas. E. de la Vergne
_____
    Chas. E. de la Vergne"

Jules Lapene was survived by one brother, Jean Baptiste Lapene, surnamed in his family Hyppolite Lapene, who died at Pau, France, on May 7, 1891, and his two natural children, Marie Antoinette Lapene, who died July 7, 1889, and Jules Numa Lapene.

Jean Baptiste Hyppolite Lapene was survived by no forced heirs, his closest relative being his cousin, Marie Sallenave Bourdet, known as the Widow Bourdet.

We do not find a birth certificate of Jules Lapene in the record. However, the record is replete with evidence that he was the son of Jean Baptiste Lapene and Anne Sallenave, who predeceased him; that he had five brothers and sisters, and that they all predeceased him, except the aforementioned Jean Baptiste Hyppolite Lapene. For the purpose of this decision, we accept as correct the evidence of Jules Lapene's birth and ancestry—secondary evidence having been offered where the best evidence was not accessible.

The aforementioned will named two co-executors, Oscar Bois and Leon Queyrouze. Oscar Bois predeceased Jules Lapene, and Leon Queyrouze died before completing the administration of the succession. The Public Administrator for the Parish of Orleans was appointed Dative Testamentary Executor, and during the ensuing years up until 1954, the Public Administrator, followed by his successors, administered the Succession of Jules Lapene. At no time was the administration completed nor a final account filed.

In 1954, the then Public Administrator for the Parish of Orleans, W. Sommer Benedict, filed a petition in the Civil District Court for the Parish of Orleans, praying that an inventory be made of property situated in the Parish of Plaquemines, State of Louisiana, belonging to the deceased, Jules Lapene. The inventory revealed that the succession owned approximately 809.51 acres of land in said parish, and after proper proceedings the property was leased for oil, gas, and other minerals, for the sum of $12,142.65.

During 1954, some twenty-one persons, Jean Tardan and others, brought the present suit, alleging that they were the sole legal descendants of Marie Sallenave Bourdet, deceased, who was the sole legal heir of Jean Baptiste Hyppolite Lapene, who was in turn the sole legal heir of Jules Lapene. They alleged that they accepted the Succession of Jules Lapene, "simply, solely, and unconditionally" and prayed that they be recognized as the sole heirs at law of the deceased, Jules Lapene, and sent into possession of his estate in the proper proportions to each. They also asked for the discharge of the Dative Testamentary Executor, alleging that there no longer existed any need for an administration of the estate. Plaintiffs were residents of the Republic of France, the Republic of Mexico, and Madagascar.

Jules Numa Lapene, Jr., brought a suit in November, 1954, alleging that he was the only child of the marriage of Eva Clark and Jules Numa Lapene, and that he was the sole and only surviving descendant of Jules Lapene. He accepted the Succession of Jules Lapene purely, simply, and unconditionally and prayed that he be recognized as the sole heir of the decedent, Jules Lapene, and sent into possession of his estate. He, likewise, prayed for the discharge of the Dative Testamentary Executor upon his rendering an accounting. His suit was consolidated in the trial court with the Tardan, et al., suit.

With respect to Jules Numa Lapene, Jr.'s claim of heirship, the record contains a copy of the marriage record of Eva Clark and Jules Numa Lapene, son of Jules Lapene and Mary Welsh. The marriage was celebrated on September 30, 1885, at the Church of the Immaculate Conception on Baronne Street in the City of New Orleans, Louisiana. This marriage record reads in part:

> "The contracting parties, having presented the license of the Honorable Joseph Holt, M. D., Sr., officio Recorder of Births, Marriages, for the Said Parish of Orleans, after the three publications of Banns, no legal impediment being known to exist."

The record further contains evidence of the solemn baptism of Jules Numa Lapene, Jr., son of Jules Numa Lapene and Eva

Clark, on July 18, 1886, at the Church of the Immaculate Conception. This baptismal record is signed by the testator, Jules Lapene, as Godfather.

There is also in the record a statement signed by the Chairman and Ex-Officio Recorder of the Board of Health for the Parish of Orleans, to the effect that an undertaker appeared before him and declared that Jules Numa Lapene, aged 47 years, died at his residence 3726 Bienville Street, New Orleans, Louisiana, on December 1, 1904. This certificate states that Jules Numa Lapene was a native of France, and that he was of the white race. A line is drawn through the word, "White," and over it is written in print the word, "Negro." A line is also drawn through the word, "France," and by its side is written in print the words, "New Orleans, La." We cannot accept these interlineations as correct. There is no proof in the record as to their authenticity; nor does the record disclose by what authority they were made. They are of a different type of writing—print—whereas, the certificate is written in longhand.

Therefore, from the evidence of record, we accept as correct the fact that Jules Numa Lapene, Jr., is the son of Jules Numa Lapene, deceased, and that Jules Numa Lapene was the natural son acknowledged by Jules Lapene in his will above quoted. Succession of Serres, 136 La. 531, 67 So. 356.

To the petition of Jean Tardan, et al., and that of Jules Numa Lapene, Jr., the Public Administrator filed a plea of thirty years prescription under LSA–Civil Code, Articles 1030 and 3548. He also filed exceptions of vagueness and no cause and no right of action and answered in the form of a general denial.

In its judgment the trial court overruled all exceptions filed by the parties litigant; overruled the plea of prescription filed by the Public Administrator; dismissed certain oppositions filed by the parties plaintiff to a provisional account of the Dative Testamentary Executor, thus approving and homologating said account; recognized Jules Numa Lapene, Jr., as the sole and only legal issue of Jules Numa Lapene, deceased, and as such entitled to an undivided one-eighth or $^{432}\!/_{3456}$ of the entire estate of the deceased, Jules Lapene; recognized Jean Baptiste Hyppolite Lapene, deceased, as the sole surviving brother of the deceased, Jules Lapene, and as such the legatee of an undivided seven-eighths of all the property left by Jules Lapene; divided the legacy of Jean Baptiste Hyppolite Lapene among Jean Tardan, et al., in proportions of 3456ths; and ordered the Dative Testamentary Executor to file a final account within fifteen days to the end that after approval and homologation the property and funds in the hands of the Dative Testamentary Executor be delivered and turned over unto the heirs and legatees of the Estate of Jules Lapene, upon the parties complying with the inheritance tax laws of this State.

The Public Administrator, now William P. Hagerty, has appealed to this Court from the above judgment. He contends that the evidence submitted by the plaintiff, Jules Numa Lapene, Jr., and by Jean Tardan, et al., is incomplete. He argues that certain French Notorieties submitted as evidence of births and deaths of Jean Baptiste Hyppolite Lapene and his heirs should not have been accepted by the trial court as evidence of these facts. He urges that the birth certificate of Jules Lapene was not produced, and that Jules Numa Lapene did not file a birth certificate showing that he was the alleged son of Jules Henry Lapene, nor did he file one for Marie Antoinette, called Anna Lapene, supposedly a daughter of the deceased, Jules Lapene.

As stated, supra, we are convinced that all parties plaintiff are the persons they represent themselves to be. None of the plaintiffs have appealed from the judgment of the trial court nor have any of them answered the appeal. Therefore, the only questions presented for our determination are whether sufficient evidence was offered to prove heirship, and whether the evidence offered was admissible. This evidence consisted principally of French Notorieties, wherein declarations were

made as to the identity and heirship of the plaintiffs.

Mr. Henry Joseph Denoix de Saint Marc, a lawyer at the Court of Appeal of Bordeaux, France, testified:

"According to the French law, the acts, specifically 'of notoriety' is an act passed before a public officer, (Notary for example) wherein it is stated the declarations of persons worthy of belief, who attest a notorious fact, in order to supplement a written act which is impossible of production."

And when asked, "Is a notarial act the usual method to enter possession of succession property?", he responded:

"The act, specifically 'of notoriety', habitually serves to establish the degree of the heirs of a deceased person and as a consequence, the existence and extent of their hereditary rights."

The following questions and answers are excerpts from the testimony of Mr. Henry Joseph Denoix de Saint Marc:

"Q. When there is no conflict between heirs does the Court render a judgment recognizing these heirs? A. As long as there is no conflict between the heirs of a deceased person the Court (in other words the judicial authority) does not have to intervene to recognize the heirs, and to transfer to them the property (or title) of the goods of the deceased.

"Q. Where there is no contest between conflicting claimants of a succession, is the notarial act accepted as proof of possession and transfer of property? A. Where there is no conflict between the claimants of an opened succession, it is the act of notoriety which, in default of acts of the Civil States (such as certificates of birth, marriage and death) establish the degree of parentage (relationship) of the claimants of the succession with the deceased, and, as a consequence, the reality and understanding of their rights in the inheritance.

"Q. What law, rules, or decisions if any prescribe the form and contents of an act of notoriety in the Republic of France? A. The act, specifically stated, of notoriety is an act which by custom is very ancient, largely utilized in the ancient French law and of which its use has remained very frequent in our days. It is notably mentioned in Article 20 of the Law of the 25 Ventose Year XI reorganizing the notariat and in the judgments of the Court of Cassation of date 5 August 1815, and 16 January, 1843, making mention of its probative force.

"Q. Are there any laws, statutes or jurisprudence to the effect that a no-

tarial act is not sufficient proof of transfer of title, and if so please give the caption, citation and substance of same? A. *There does not exist any law, statute or jurisprudence denying to an act of notoriety the probative force of hereditary right.*" (Emphasis ours.)

The above testimony convinces us that the French Notorieties presented in evidence were secondary evidence under our Louisiana Law. However, they were the best evidence that could be produced by counsel for the plaintiffs.

In Thomas v. Thomas, 2 La. 166, we pronounced the following rule, which still exists as the Law of Evidence:

"* * * The law of evidence, would have a poor claim to the praise justly bestowed on it, if it did not foresee and provide for such a case as this. That rule which is the most universal, namely, that the best evidence the nature of the case will admit, shall be produced, decides this objection; for it is only another form of expression for the idea, that when you lose the higher proof you may offer the next best in your power. The case admits of no better evidence than that which you possess, if the superior proof has been lost without your fault. The rule does not mean that men's rights are to be sacrificed and their property lost, because they cannot guard against events beyond their control. It only means, that so long as the higher or superior evidence is within your possession, or may be reached by you, you shall give no inferior proof in relation to it. Particular rules which require written proof, always relax themselves to meet absolute necessity, or that necessity which is occasioned by occurrences common among men."

See, also, Franklin v. First African Baptist Church of New Orleans, 2 La.App. 698, wherein it was stated:

"The best evidence rule requires that 'the highest degree of proof of which the case from its nature is susceptible must, if accessible, be produced'. But if the best evidence can not be produced then 'the next best evidence should be admitted'. * * *"

In the case of Succession of Marcour, 180 La. 129, 156 So. 198, 203, this Court held that hearsay evidence is admissible to prove descent, relationship, and facts as to birth, marriage, and death, and dates thereof, stating:

"Counsel for appellee objected to the offer in evidence of the undertaker's record and the newspaper article, on the ground they were hearsay. But an exception to the rule against the admission of hearsay testimony has been recognized in cases involving pedigree.

In such cases hearsay is admissible to prove not only descent and relationship, but also facts as to birth, marriage, and death, and the date when the events occurred. The exception to the general rule is founded on the necessity which arises from the essentially perishable nature of the probative facts and the very limited number of persons who can be assumed to have either interest in or knowledge of ancient facts of such slight general importance and of a nature at once so exact and so trivial. The undertaker's record was made and the newspaper article was written and published at a time unsuspicious, and we think they were admissible, if for no other purpose, as corroborative of other evidence, both oral and documentary, adduced on the trial of the case." See, also, in re Gray's Succession, 201 La. 121, 9 So.2d 481.

We, therefore, conclude that the evidence presented was adequate and sufficient as secondary evidence to prove heirship and was properly admitted by the trial court.

█ The Public Administrator further contends on appeal that even if the plaintiffs have properly asserted their claims to the Estate of Jules Lapene, their rights have prescribed under Articles 1030 and 3548 of the LSA–Civil Code,[1] since thirty years of inaction have elapsed from the death of the testator. It is urged that the prescription of thirty years has run in favor of the State, and that the land herein involved should escheat to the State of Louisiana.[2]

In Succession of Tyson, 186 La. 516, 172 So. 772, we held that under the clear provisions of the Articles of the Code, it was never intended that a succession should escheat to the State, except in default of any heirs. In the instant case there are heirs of the deceased, and they have not pleaded the prescription of Article 1030 against one another. The ruling of Sun Oil Co. v. Tarver, 219 La. 103, 52 So.2d 437, 443, to the effect that:

" * * * it seems manifest that a trespasser, or one holding land or other succession property without semblance of right or title, as in Generes v. Bowie Lumber Co. [143 La. 811, 79 So. 413] * * * either by conveyances from the succession representatives or heirs or by an acquired prescription, cannot

1. "The faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables." LSA–C.C. Art. 1030.
    "All actions for immovable property, or for an entire estate, as a succession, are prescribed by thirty years." LSA–C.C. Art. 3548.

2. "The succession (successions) of persons who die without heirs, or which are not claimed by those having a right to them, belong to the State." LSA–C.C. Art. 485.

plead the prescription provided for in Article 1030 as the faculty lost by the heir, who fails to accept within thirty years, can only be availed of by the succession or those claiming through it * * *"

was reaffirmed in Lee v. Jones, 224 La. 231, 69 So.2d 26, 31, when we stated:

"The prescription mentioned in the above article [1030] is that of thirty years. In the Sun Oil case, supra, we held that the above prescription could only be plead by coheirs and their transferees who had accepted the succession, or by the succession against a forced heir. This ruling seems to be unpretentious and unassailable."

There has been no possession of the property in the Public Administrator for the State of Louisiana. He has merely acted as a public officer for the Parish of Orleans, performing those duties designated to his position by law. Under no condition, where there are heirs, could the liberative prescription provided for by Article 3548 of the LSA–Civil Code accrue to such administration. See, Lee v. Jones, supra; Harang v. Golden Ranch Land & Drainage Co., 143 La. 982, 79 So. 768.

For the reasons assigned, the judgment of the trial court is affirmed. All costs of these proceedings are to be paid by the succession.