153 So.2d 498 (1963)
STATE ex rel. James LYTELL
v.
LOUISIANA STATE BOARD OF HEALTH, through its President, Dr. W. J. REIN.
No. 1021.
Court of Appeal of Louisiana, Fourth Circuit.
May 6, 1963.
Rehearing Denied June 4, 1963.
*499 Sam Monk Zelden, Max Zelden, New Orleans, for plaintiff-appellant.
Ingard O. Johannesen, New Orleans, for defendant-appellee
Before McBRIDE, REGAN, YARRUT, SAMUEL and HALL, JJ.
YARRUT, Judge.
This mandamus suit was brought by James Lytell, and three of his five living children (Sadie Lytell Cox, Margaret Lytell Brooks and Paul L. Lytell), to compel Defendant to issue delayed birth certificates declaring them to be "white" persons; and in behalf of a deceased daughter, Eunice, to correct her death certificate, issued in 1918, designating her as "colored." The trial court rendered judgment for Defendant, denying relief to all Relators.
Reference to Relator in the singular will be to James Lytell. Relator is about 65 years of age, and has never been issued a birth certificate.
The relief sought by Relators depends upon the correctness vel non of the State's public vital statistics records, which are presumed to be correct, and that the officer, whose duty it was to make them, properly performed his duty; subject, however, to rebuttal by evidence to the contrary. Superior Oil Co. v. Reily, 234 La. 621, 100 So.2d 888; Sweet v. Brown, La.App., 125 So.2d 261; Wright v. Cyprian, La.App., 96 So.2d 882; State ex rel. McGregor v. Diamond, La.App., 167 So. 760; Sage v. Board of Liquidation, 37 La.Ann. 412; 20 Am. Jur. 984, p. 831.
Defendant, in resisting Relators' claim, introduced parol, church baptismal, and the Federal census records of 1870 and 1880. Relators objected to the admissibility of the census and church records.
The Federal statutes introduced by Defendant relate to the use of the census records and read, inter alia:
13 U.S.C.A. § 8
"(a) The Secretary may, upon a written request, and in his discretion, furnish to Governors of States and Territories, courts of record, and individuals, data for genealogical and other proper purposes, from the population, agriculture, and housing schedules prepared under the authority of subchapter II of chapter 5, upon the payment of the actual, or estimated cost of searching the records and $1 for supplying a certificate.
"(b) The Secretary may furnish transcripts or copies of tables and other census records and make special statistical compilations and surveys for State or local officials, private concerns, or individuals upon the payment of the actual, or estimated cost of such work. In the case of non-profit organizations *500 or agencies the Secretary may engage in joint statistical projects, the cost of which shall be shared equitably as determined by the Secretary and provided that the purposes are otherwise authorized by law.
"(c) In no case shall information furnished under the authority of this section be used to the detriment of the persons to whom such information relates. * * *"
13 U.S.C.A. § 9
"* * * No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding. As amended Oct. 15, 1962, Pub.L. 87-813, 76 Stat. 922."
We find no Federal decision that such records cannot be used by a sovereign state in defense of its own vital statistics records, when the integrity of the latter is attacked by one claiming immunity under the Federal statutes.
Defendant obtained the census records from the public library which obtained them under 13 U.S.C.A. § 8(b). Recent decisions state that the prohibition against their use under Sec. 9, is only against officials receiving such information, and does not generally clothe them with secrecy. St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240.
A South Carolina Court passed on Sec. 8 (Edwards v. Edwards, 239 S.C. 85, 121 S.E.2d 432, in relation to the question of "detriment." There the court held that, as the Federal census showed Plaintiff was a natural child of deceased and was entitled, along with defendants, to share in inheritance, the census report was not being used to the "detriment" of defendants within the terms of the statute, notwithstanding each defendant suffered a reduction in his inheritance by the inclusion of plaintiff among the distributees.
The census records of 1870 and 1880 list Relator's father, Etienne Lightell; his grandfather, Felix Lightell; and a paternal aunt, Eliza Lightell; "as mulattoes;" and that Felix Lightell was married to Clara J. Lightell, alias Julia Ancar, who had a son, Etienne, listed as a 12-year old mulatto male in the 1870 census, and as a 20-year old mulatto male in the 1880 census. Also listed in the 1880 census is a daughter, Eliza, a mulatto female, age 8 (Relator's paternal aunt).
Relator's application for a marriage license, dated November 20, 1913, names his father as E. Lightell, and his mother as Angelina Lightell. In addition, Relator admitted in court that his father was Etienne Lytell and his mother, Angelina Blazio.
The death certificate of Relator's father, Etienne Lightell, who died in 1938, states that he was the son of Felix Lightell and Julia Ancar.
The baptismal record of St. Thomas Church, Pointe-a-la-Hache, La., colored Book No. 5, on page 129, shows that Eliza Lightell, child of Felix Lightell and Julia Ancar, was born in Pointe-a-la-Hache December 6, 1870, and baptized on December 22, 1873; and at page 152, that Odona Lightell, also a child of Felix Lightell and Julia Ancar, was born at Pointe-a-la-Hache, February 3, 1876, and baptized on August 23, 1876.
Relators objected to the introduction of these baptismal records for lack of opportunity to cross-examine those who gave the information and the church official who *501 made them. This objection is without merit. State ex rel. Dupas v. City of New Orleans, 240 La. 820, 125 So.2d 375; Succession of Gaudinse, 187 La. 844, 175 So. 595.
Relator's wife, Lydia (Alcidia) Hingle, had no birth certificate. On her death certificate of January 25, 1961, her father was listed as Victor J. Hingle, mother unknown, which information was given by her son, Paul Lytell, one of the Relators herein.
According to her application for a marriage license, Alcidia Hingle's father was Joseph Hingle and her mother was Annie Bartholemew. Joseph Hingle's death certificate of November 27, 1934, lists him and his parents, Ambrose Hingle and Paulovna Casbon, as colored.
The death certificates of Alcidia Hingle's paternal uncle and aunt, Rouel Hingle and Olivia Hingle, show them both to be colored; and Rouel Hingle's father is listed as Ambrose Hingle, his mother unknown; and Olivia Hingle, who married a Buras, is shown to be the child of Ambrose Hingle and Poliva Casbon, which information was furnished by her brother, Rouel.
Defendant also produced witnesses from Plaquemines Parish who had known Relator, his parents, or his wife's parents in that Parish, where Relator lived until 1915.
The first of these witnesses, Mr. John Vogt, personally knew Relator, identified him in open court by his right arm, deformed since birth, and testified that Relator always associated with negroes while working on his father's farm in Plaquemines Parish before 1915. He knew Relator's father, Etienne, as colored; and that Etienne grazed his cattle on his father's farm; that Relator married the daughter of Joseph Villiere Hingle, also colored. He did not know Lydia Hingle personally.
Mr. Charles E. Fox identified Relator in court and testified he employed him as a laborer on his farm between 1909 and 1915; that Relator was accepted as a negro and ate with them; that Relator's father, Etienne, was accepted as a mulatto in the community; and Relator married Villiere Hingle's daughter.
Mrs. Bertha North testified she did not know Relator, but had taught catechism to Lydia Hingle; that she knew Lydia Hingle as well as her parents, Joseph Villiere Hingle and Annie Bartholemew, all of whom were referred to in the community as mulattoes; that Rouel and Olivia Hingle were negroes.
The record further shows that Relator married Lydia Hingle in Jefferson Parish in 1913, although Lydia Hingle bore him a child in 1911; that they moved from Plaquemines Parish some time after the 1915 hurricane to Jefferson Parish, where Relator now resides; that a daughter, Eunice (Una), was born in 1917, and died in 1918; that there was an alteration on Eunice's death certificate, changing her race from white to colored. Under the authority of LSA-R.S. 40:159 and Succession of Lapene, 233 La. 129, 96 So.2d 321, altered records are not binding.
Two of Relators, Mrs. Sadie Lytell Cox and Mrs. Margaret Lytell Brooks, testified they attended white schools in Jefferson Parish; had always lived in that community as white people; and that they knew no other relatives than their parents.
Relators' other witnesses testified they knew Relators only since they moved to Jefferson Parish and always believed them to be white. One witness recalled meeting Relator's sister-in-law at Relator's wife's funeral, although Relator himself denied knowing any of his wife's brothers and sisters.
As to the spelling of Relator's last name, the records show that on January 10, 1956 he made an affidavit addressed to the Clerk of Court of Jefferson Parish, wherein he stated that in the marriage license of November 29, 1915 "he inadvertently and erroneously spelled his name as James *502 Lightell, instead of James Lytell," requesting that his name on the certificate and license be changed accordingly. The change was made on January 11, 1956 by an affidavit before a notary public, not a judicial proceeding.
In Sunseri v. Cassagne, 191 La. 209, 185 So. 1, a husband sought to annul his marriage because his wife had negro blood. The trial court annulled the marriage. The Supreme Court remanded the case, stating:
"In our discussion of the evidence submitted by the respective parties, we have not considered the effect of the three certificates which were issued by the Recorder of Births and Marriages for the Parish of Orleans, reciting that Verna Cassagne, the defendant, is colored, and that her aunts, Camille Cusachs and Margo Marie Cusachs, and their respective husbands were married as members of the colored race. Apart from these certificates, the evidence, while persuasive, is not conclusive and does not warrant us in holding that defendant is a member of the colored race, particularly in view of the overwhelming testimony that she and her immediate associates have always been regarded as members of the white race and have associated with persons of that race. The recitals of the certificates are presumably correct and, if permitted to stand, will be decisive of the issues involved in this case."
When the case was again submitted to the Supreme Court, 195 La. 19, 196 So. 7, the court stated it had been of the opinion that defendant's wife should have been given opportunity to show the incorrectness of these records, since her marriage should not be annulled on the ground she was colored "unless the evidence adduced leaves no room for doubt that such is the case." This time the court affirmed the judgment of the trial court annulling the marriage on the ground that the wife was colored.
State ex rel. Treadaway v. Louisiana State Board of Health, La.App., 54 So.2d 343, was a mandamus proceeding to compel correction of a death certificate to show relator's mother was white and not colored. The court followed the Sunseri cases, supra, and held that evidence failed to establish that the registration of the mother as colored was incorrect. Upon rehearing, 56 So.2d 249, the court noted Villa v. Lacoste, 213 La. 654, 35 So.2d 419, in which it held that certificates of the State Board of Health constituted only prima facie proof of the correctness of the statements contained therein, and that relator's evidence was ample to overcome the prima facie public record. The court, in re-instating its original decree, stated:
"In Sunseri v. Cassagne, 191 La. 209, 185 So. 1, 5, the Supreme Court, in another somewhat similar matter, held that a person who has been commonly accepted as being of the Caucasian race should not be held to be of the colored race `unless all the evidence adduced leaves no room for doubt that such is the case.'
"The Supreme Court remanded the the matter in order that further evidence might be adduced and finally held that there was no doubt, and maintained the correctness of the certificates which were there involved and which showed the defendant to be colored.

* * * * * *
"We interpret the language used in the Sunseri case and quoted above as indicating that the proof in such case should be even more convincing than that which is necessary in such cases as must be proved `beyond a reasonable doubt.' We feel that the language used by the Supreme Court means that there must be no doubt at all. * * *"
Green v. City of New Orleans, La.App., 88 So.2d 76, was a mandamus to change the birth certificate of an infant girl from *503 white to colored, because the relator, a colored person, wanted to adopt the child. The Court of Appeal held the evidence was insufficient to prove beyond any doubt that the girl was at least part negro, as required for such a change of the Vital Statistic records. The Court quoted from the Supreme Court's decision on certiorari in the Treadaway case, 221 La. 1048, 61 So.2d 735, as follows:
"* * * Relator must show that he has a clear legal right to have the correction made. The legal certainty of the proof submitted must be such as to compel the Registrar of Vital Statistics to perform the ministerial duty of changing the recordation from `Colored' to `White.' The proof of record falls far short of any such assumption. As the name indicates, the records kept by the Registrar are vital to the general public welfare. The registration of a birthright must be given as much sanctity in the law as the registration of a property right. * * *"
The most recent decision by this Court is State ex rel. Cousin v. Louisiana State Board of Health, La.App., 138 So.2d 829. There, we stated that relator must show "beyond any doubt at all that he is entitled to a certificate showing that he belongs to the white race." Writs were granted by the Supreme Court but, before that Court could act, relator died, so the writ was dismissed as moot; in effect, suspending the authority of our decision.
Regardless of the rule of proof declared in the suspended Cousin case, Relators here have not shown, even by a mere preponderance of the evidence required of a plaintiff in an ordinary case, that they are entitled to the relief prayed. Relators offered no witnesses from Plaquemines Parish to refute, rebut, or contradict the testimony of Defendant's witnesses from that Parish, or the prima facie correctness of the public and church baptismal records. Their failure to do so must lead to the conclusion that they were unable to do so.
If this record contained only evidence of the acceptance of James Lytell and his children in Jefferson Parish as white persons, birth certificates declaring them to be white should properly be issued. However, the State, Federal and Church records show Relator to be the child of mulattoes. Under the second Sunseri case, supra, anyone with a traceable amount of negro blood is legally deemed to be of the colored race. Since James Lytell is colored, his children are colored.
The trial judge gave no reasons for judgment, but simply dismissed Relators' suit. Necessarily, he must have found Relators to be negroes, and we find no error in his determination.
For the above and foregoing reasons, the judgment of the District Court is affirmed; costs in both courts to be paid by Relators.
Affirmed.