REID, Judge.
The plaintiffs in this suit, State of Louisiana, the State Mineral Board, Sinclair Oil and Gas Company, Sohio Petroleum Company, Peoples Production Company, El Paso Natural Gas Company and Western Natural Gas Company originally filed this suit as an action of jactitation or slander of title against Albin P. Scott.
The plaintiff State of Louisiana claimed to be the owner of the following described property, to-wit:
“From the NE corner of State Lease 2008 (now expired) having Lambert Coordinates of X = 2,313,686.72 and Y = 144,217.48 go S. 0°29' 27" E 3260.71' to point of beginning. Said point of beginning has Lambert Coordinates of X = 2,313,714.66 and Y = 140,956.89. From the point of beginning go N 67° 4' 54" E 6665.66' to a point having- *879 Lambert Coordinates of X = 2,319,854.14 and Y = 143,522.62, thence S 0° 0' 0" 9222.62'' to a point having Lambert Coordinates of X = 2,319,854.14 and Y = 134,330.00, thence W 0° O' 0" 14,758.04 feet to a point having Lambert Coordinates of X = 2,305,096.10 and Y — 134,300.00 thence N 0° O' 0" 3,513.64' to a point having Lambert Coordinates of X = 2,305,966.10 and Y = 137,843.64, thence N 89° 30' 33" E 2,076.35' to a point having Lambert Coordinates of X = 2,307,172.35 and Y = 137,861.43, thence N 0° 29' 27" W 843.49' to a point having Lambert Coordinates of X = 2,307,165.125 and Y = 138,704.889 thence N 86° 3T 00" E 4022.56' to a point having Lambert Coordinates of X = 2,311,180.182 and Y = 138,950.46, thence N 55° 36' 31" E 3074.39' to a point having Lambert Coordinates of X = 2,313,717.163 and Y = 140,686.956, thence N 0° 29' 27" W. 269.78 ft. to point having Lambert Coordinates of X = 2,313,714.66 and Y = 140,956.89 constituting part of Tract No. 5605 — La-fourche and/or Terrebonne Parishes, Louisiana.”
Sinclair Oil and Gas Company is a mineral lessee of said property by virtue of a mineral lease No. 2490 dated April 15, 1954, and the remaining plaintiffs are the assignees of an undivided interest in said mineral lease by assignments from the Sinclair Oil and Gas Company.
The plaintiffs alleged that they are in actual possession of said property and had been for more than one year, and had been engaged in developing minerals and producing same from said tract. They allege that Albín P. Scott had slandered their title and continued to do so by claiming the following described property, to-wit;
“Lots 2 and 3 Section 15, all of tract Sections 7, 8, 17 and (Sea Marsh) Section No. 18, Township No. 24 S Range No. 21 E. in the S.E. west of river Land District, containing 1321.26 acres, according to the official plat of survey of said lands in State Land Office, situated in the Parishes of Lafourche and/or Terrebonne, State of Louisiana.”
In addition the plaintiffs claim that the property claimed by Scott lies within the tract owned by the State of Louisiana and leased by it to Sinclair Oil and Gas Company and that said property claimed by Scott has subsided beneath the waters of the Gulf of Mexico.
The slander plaintiffs complained of is that Albín P. Scott recorded in the Conveyance Records of the Parishes of Lafourche and Terrebonne on June 15, 1954 an act of sale from Jules N. Lapene Et A1 to him purporting to convey the property described as claimed by Scott, but claimed that this deed would have no legal effect because the land had subsided and become by erosion a part of the bed of the Gulf of Mexico and is no longer privately owned. They prayed that they be recognized as the possessors of said property, waterbottom and subsided land within the tract claimed by the State and that the defendant be ordered to either disclaim any interest or assert within a reasonable delay such rights as he claims to have against said property.
The defendant filed exceptions to jurisdiction, prayer for oyer of State lease 2490 declared upon by the plaintiffs, exception of misjoinder of parties plaintiff, exceptions of no cause and no right of action, exception of prescription, exception of improper accumulation of action, exception of non-joinder of parties plaintiff, and exception of vagueness.
Plaintiffs filed in response to the prayer for oyer a copy of State Lease No. 2490 dated April 15, 1954.
Plaintiffs also filed a supplemental and amended petition alleging that the property in fact is in Lafourche Parish.
The Court overruled all the exceptions, except the one to jurisdiction and held that this had been cured with the filing of the *880 supplemental and amended petition and further held that the prayer for oyer had been complied with by the filing of the copy of the lease.
Defendant then filed an answer, admitting that the State purported to grant the mineral lease declared upon in the petition but denied its validity, denied that the plaintiffs were assignees of an undivided interest in the purported lease, denied the possession of the State, admitting the rec-ordation of the act of sale to him as set forth in plaintiffs’ petition and in answer to the supplemental and amended petition admitted that the property in dispute was located in the Parish of Lafourche, further alleging that in the event subsequent surveys showed the property to be located in any other Parish defendant reserved his right to file subsequent and appropriate pleadings, and reserved his right for damages. He also alleged that he was the legal owner of the property in dispute.
Plaintiffs then filed a rule against the defendant alleging that defendant had filed an answer in which he denied State of Louisiana was the owner of the property and alleges that he is the legal owner of the property in dispute, and will within the time allowed by the Court bring a petitory action in revindication of the title; further alleged that in any action of jactitation or slander of title any defendant desiring to raise as a defense a lack of sufficient possession must do so by exceptions filed in limine litis and that all exceptions not filed in limine litis are to be considered waived and prays for judgment on a rule recognizing plaintiffs’ possession of said waterbot-toms and subsided land and ordering the defendant to disclaim any title whatever or assert within a time to be fixed such right as he claims to have against said property.
The Trial Court rendered judgment making the rule absolute and ordering the & defendant Albin P. Scott to assert such right as he claimed to have against the property involved herein within sixty days from date of the judgment, or to disclaim any title whatsoever thereto.
The defendant within the time limit allowed by the Court filed a petitory action alleging that he was the owner of some 1321.26 acres described heretofore as claimed by him according to the official plat of the survey of said lands in the State Land Office situated in the Parishes of Lafourche and/or Terrebonne, State of Louisiana. He alleged that he purchased said land from Jules N. Lapene and Michael H. Bagot by deed dated June 11, 1954 and recorded in Conveyance Book 181, page 375 of the records of the Parish of Lafourche and in Conveyance Book 208 records of the Parish of Terrebonne, Louisiana. He alleged that Bagot acquired a contingent interest in said property from the other co-vendor, Jules N. Lapene. Pie then alleged that Jules N. Lapene acquired said property through representation of his father Jules Numa Lapene, deceased, who was the acknowledged son of Jules Lapene, the original patentee, as per Probate Number 26797 on the Docket of the Civil District Court, Parish of Orleans, in the matter of Succession of Lapene reported in 233 La. 129, 96 So.2d 321.
Scott then alleges that Jules Lapene acquired said property by Patent No. 5242 of the State of Louisiana, signed by the Governor and the Registrar on June 7, 1883, and a certified copy of which was attached to the petition in the petitory action. He prays that he be recognized as the legal owner of the property and all claims of the plaintiffs be rejected, and that they be ordered to vacate the premises claimed by him, and asked for reservation of his rights to sue for damages.
Plaintiffs-defendants in the petitory action filed an exception alleging that no cause or right of action existed because insofar as the area involved there is no land above water, all the land within said area which was originally patented to Jules Lapene is now submerged beneath the waters of the Gulf of Mexico, and there *881 fore the area is no longer privately owned, but is now owned by the State of Louisiana.
Plaintiffs-defendants in the petitory action filed an answer with full reservation of their rights under their exception of no right and no cause of action, and denied the title of the defendant and plaintiff in petitory action, and alleged that the State was the owner of lands heretofore originally set out and that the other plaintiffs are mineral lessees and assignees of the mineral leases of the State of Louisiana, under State Lease No. 2490. They further allege that the State of Louisiana has been at all pertinent times in possession of the property and further answering allege that the claims of Albin P. Scott are to water-bottoms and additional lands that have subsided beneath the waters of the Gulf of Mexico, and such land has become by erosion a part of the bed of the Gulf of Mexico and is therefore insusceptible to private ownership. Plaintiffs and defendant in petitory action filed an additional answer with full reservation of their rights under their exception which answer covers essentially the same allegations set forth in the original answer.
The case was tried on February 17, 1960, but continued to permit the defendant Scott, now plaintiff in the petitory action, to cross examine Aubrey Burke if he desired.
At this time the attorneys for the plaintiff and defendants entered into a stipulation which reads as follows:
“It is now stipulated that the area in litigation had been washed away or had subsided and had been covered by water for more than six years before the present suit was filed and that counsel for Albin P. Scott do not wish to cross examine Mr. Burke and the taking of testimony is closed.
Subsequent to this on March 3, 1961 Scott filed a motion to reopen the evidence on the grounds that he now has available certain maps which would show that the land was partly submerged in 1853 and that he had no knowledge of the existence of said maps and said maps would have an important bearing upon the condition of the land in question subsequent to the 1837 survey.
On November 30, 1961 a petition of intervention was filed by Jean Tardan, Roger Tardan, Gorges Tardan, Victor Tar-dan, Pierre Tardan, Annie Marie Tardan, Suzanne Tardan, Jean Tardan, Mrs. Marie Tardan Duprat, Mrs. Catherine Julie Tar-dan, Mrs. Marie Tardan Bizos, Mrs. El-freda Elias Tardan, Martha Tardan, Mrs. Cecile Tardan Eymard, Andre Marie Charles Lapeyre, Justine Francois Lapeyre, Charles Louis Jean Lapeyre, Anna Marie Eugenie Lapeyre, Jean Henry Marie Lap-eyre, Mrs. Odetta Barthouil Buillion, Jean Jacques Chapelier Sailhan, Paul Pierre Louis Chapelier Sailhan, Auguste Tardan, all claiming to be the owners of an undivided Jáths interest in the property in dispute and alleging that Scott only purchased an undivided y$th interest and alleged that they were put in possession of said Jfjths interest by acts de notoriete dated September 2, 1961 and pray that they be recognized as the owners of an undivided J^ths interest in said property, with the reservation of their rights to claim damages. Attached to this petition is a judgment of the Civil District Court of New Orleans dated March 2, 1961 in the Succession of Jules Lapene No. 26747 and 26797 consolidated under number 26797.
The original plaintiffs, defendants in the petitory action, filed an answer to the petition of intervention denying all the allegations.
The Trial Judge with written reasons filed in the record rendered and signed a judgment on February 3, 1965 in favor of the original plaintiffs and defendants in the petitory action, namely, State of Louisiana, State Mineral Board, Sinclair Oil and Gas Company, Sohio Petroleum Company, Peoples Production Company, El Paso Natural Gas Company and Western *882 Natural Gas Company and against Albín P. Scott and the Intcrvenors, dismissing the petitory action and the petition of intervention at their costs, and recognizing and decreeing that the ownership and title to the land in question belonged to the State of Louisiana. From this judgment the defendant in the original matter and plaintiff in reconvention, together with the In-tervenors have brought this devolutive appeal, to this Court.
The appellants set out two specifications of error, to-wit:
“1. The Lower Court erred in holding that this cause is not governed by the decision of the Louisiana Supreme Court in California Company vs. Price, 225 La. 706, 74 So.2d 1 (1954)
2. In the event this Court determins what no error was committed in refusing to apply California Company vs. Price, supra, the Lower Court nevertheless erred in its application of Miami Corporation vs. State, 186 La. 784, 173 So. 315. (1936)”
Basically the application of these two cases cited in the specifications of error has to be determined by the condition of the land in dispute at the time of the issuance of the patent in 1883. If the land described in the patent was under water at the time of the issuance of the patent then this case would come under the Price case, supra. However, if it were marsh land subject to overflow as set out in the patent and survey then it would come under the case of Miami Corporation v. State, supra.
The first question to be determined would be the condition of the land at the time of the issuance of the patent. The original patent as issued to Jules Lapene was made pursuant to Act 75 of 1880. Section 11 of this Act reads as follows:
“Be it further enacted, etc., That the public lands donated by Congress to the State of Louisiana, designated as sea marsh or prairie, subject to tidal overflow, so as to render them unfit for settlement and cultivation, shall be subject to entry and sale at the rate of twelve and a half cents per acre; provided, that satisfactory proof of said fact be filed with the Register of the State Land Office.”
The description and the patent issued to Jules Lapene dated June 7, 1883 reads as follows:
“Lots 2 and 3 Section 15 all of fractional Sections 7, 8, 17 and Section No. 18 (Sea Marsh) Township 24, South Range 21 East, and from the southeast west of River Land District containing 1321.26 acres, according to the official plat of survey of said lands in the State Land Office.”
A receipt issued by the State of Louisiana by the State Treasurer and Receiver of the State Land Office No. 331 shows that Jules Lapene paid $165.16 for the purchase of the land covered by the patent containing 1321.26 acres at 12i/^ per acre.
It is therefore clear under provisions of Act 75 of 1880 that Lapene bought this land from the State of Louisiana as sea marsh or prairie subject to overflow, so as to render the land unfit for settlement and cultivation, and paid for it at the price fixed by the Act of 12J/£$S per acre. We do not see now how the defendant and plaintiff in reconvention Scott can question the fact that this land at the time it was purchased from the State of Louisiana was marsh land subject to tidal overflow.
There is no question but what the State intended to sell and Lapene intended to buy land which was subject to reclamation and use as distinguished from waterbottoms or other property which might be insusceptible to reclamation. This is further verified by the fact that the Act of Congress on March 2,1849 c. 87, 9 statutes 352 granted to the State of Louisiana swamps and overflowed lands to aid in the construction *883 of levees and drains to reclaim such land. The purposes of the grant were rewritten into RS Section 2479, now 43 U.S.C. § 982 and were made applicable to all States.
43 U.S.C. § 982 reads as follows:
“982. Grant to States to aid in construction of levees and drains.
“To enable the several States (but not including the States of Kansas, Nebraska, and Nevada) to construct the necessary levees and drains, to reclaim the swamp and overflowed lands therein — the whole of the swamp and overflowed lands, made unfit thereby for cultivation, and remaining unsold on or after the 28th day of September, A.D. 1850, are granted and belong to the several States respectively, in which said lands are situated * * *.”
The official plat of the survey of these lands in the State Land Office which is the description by which the patent was issued is governed by three maps, the Connelly survey of 1837, John LaTourett map of 1853, and the T. S. Hardee map of 1871. The Connelly survey is an official U. S. survey and shows the Lapene property to be the land on Timbalier Island. The LaTourette map is a general map and shows no sectional surveys. The Hardee map of 1871 is designated as “Official Map of Louisiana * * * From Recent Surveys and Investigations and Officially Compiled Under Authority of the State Legislature” (Act 166 of 1868). The two official maps, the Hardee map and the Connelly map show the lands, and the sections purchased by Lapene as land on Timbalier Island.
By virtue of the fact that the patent, 'the certification of entry, the official plat and the State Tax Book together with the allegations of Scott setting forth the description and referring to the official survey and the patent all disclose that the lands sold to Lapene were swamp and overflowed lands and that thereby Scott is estopped from denying the recitals in these official documents as to the nature of the lands in dispute.
In order to bring this case under the jurisprudence of the Price case and to overcome this plea of estoppel, the plaintiff in the petitory action has put on the Stand one Dr. Martin Wright as an expert witness to show that actually at the time of the issuance of the patent the land was already submerged and was not actually what the patent said it was. Dr. Wright gave a very interesting dissertation on the shifting of the sands and particularly the effect of the hurricane of 1886 upon Timbalier Island and other islands in the Gulf, how portions of the islands were shifted in certain directions.
We do not see how this can overcome the fact that the Connelly map and Hardee map' both show Timbalier Island and that portion of it covered by the description patented by Lapene was actually land at the time of the issuance of the patent, or at least marsh land subject to tidal overflow.
Dr. Wright interpreted additional maps; made at later dates affecting the property-in dispute and which maps mainly a map' made by the U. S. Coast and Geodetic Survey of 1887 and aerial photographs made-by the U.S. Navy in 1950 showing the land in question partly submerged as compared' to the survey in 1837. State of Louisiana called an expert Dr. William D. McIntyre who had excellent qualifications in the field' of geography in relation to geomorphology. Dr. McIntyre testified that no one in his experience of studies could say exactly where or what were the confines of the boundaries or limits of Timbalier Island' in 1883. His testimony brought out the fact that these coastal areas were affected by storms but that he still could not pinpoint the boundaries of 1883, and he did not think that the overlaying of the 1887 map, nor the 1837 map could tell us where the Island was in 1883.
*884 Dr. McIntyre in response to questions testified in this respect as follows:
“Q: Now, Doctor, assuming that Tim-balier Island was correctly located by the Connelly survey in 1837, I’m not going to ask you to give its correct location in 1883, I’m only going to ask you whether a map of 1887 can be relied on as showing its location in 1883 ?
A: It’s my opinion that you couldn’t specifically because this process here is not a uniform process that’s going on over this entire period, and I think it’s erroneous to apply this kind of technique to a process where you are trying to pinpoint something specifically, and this is the way our work is going. We want to get to the details, and I don’t think that this kind of projection is reliable. (Pages 16, 17)
Q: Doctor, Dr. Wright testified, so I believe, that the damages done by these storms should be expected to be repaired within a year and that these storms are not accountable for the changes which occur in the islands or in their location, is that your opinion too?
A: No sir, I look at effects of storms as something more important than this. We have evidence here in our coastal area and in many places where the effects of storms have been permanent. Now, getting back to the first part of your question, that you would expect it to be repaired soon after the storm. This is true, but this is the process that you get your coastal changes in filling up the gaps is when you get your most rapid times of coastal retreat. This is precisely what I’m talking about, except that you do— this is what causes your faster rates of changes here. The coastline is chopped up as the photograph in this report will show, and its going to take a lot more sand to build a beach and to adjust to the condition it was prior to the storm. Much of this material has been spread out to the rear of the present beach, and it isn’t out in the Gulf where it can be worked back on to the coastline; so you must ask yourself where the source of sediments are going to come from to repair these beaches; and the primary source of the sediment is obviously from the working back of the beach, and reworking the sands out of the exposed and exhumed marsh or surface that was setting beneath the beaches. And then when this gets back to a point where it reaches the stability or equilibrium of the wave base, the sea floor at the shoreline, then you are going to have conditions — more stable conditions, where things don’t happen so fast.”
However, we do not believe that the testimony of Dr. Wright rebutted by the testimony of Dr. McIntyre and by the Act which granted these lands from the United States to the State of Louisiana the patent, the receipt and the consideration paid for the property can change the presumption as to the nature of the land at the time the patent was issued, as being what the patent sets out, namely sea marsh lands. The facts convince us that at the time of the issuance of the patent Lapene bought marsh land subject to tidal overflow, he paid for it at the price set out in the Act and the plaintiff in the petitory action, Scott, has not borne the burden of proof to show that the condition of this land was otherwise.
Having concluded that the property in question was land at the time of the issuance of the patent we will take up the question of whether it is land or sea at the present time. In order for the plaintiff in petitory action to maintain his title he has to show that the property is still land and has not been eroded into the sea. We think this is covered by the stipulation on August 16, 1960 wherein the parties to this suit admit and stipulate that the area in litigation has been washed away and had subsided and had been covered by water for more than six years before the present suit was filed.
This brings us to the discussion of California Company v. Price, supra, relied upon by plaintiff in the petitory action, and *885 Miami Corporation v. State of Louisiana, supra, relied upon by the defendants in the petitory action.
In the Price case the patent purported to coyer the bed of the sea and the official plat referred to in the Price patent shows that the bed of the sea or bay was actually conveyed. The decision of the Court in the Price case merely held that suits to attack the validity of patents was prescribed by six years under the provisions of Act No. 62 of 1912.
We quote from the Price case, supra, as follows:
“[9] This we will not and should not do. The manifest purpose of Act No. 62 of 1912 was to stabilize titles issued by the State over the signature of the Governor and Registrar of the State Land Office in cases wherein the State and other interested parties failed to contest the patents within a stated time. Thus, primarily, the act invited attacks on unauthorized patents and did not effect immediate confirmation, as ample time, six years, was given to proceed. But, as we have heretofore said, when the stated time elapsed without action, the curative provisions of the law became operative and rendered all such patents unassailable.” 74 So.2d 14.
The California case was followed by this Court in State v. Cenac, 341 La. 1055, 132 So.2d 897. In both of these cases the State issued patents covering the beds of navigable waters. More than six years had elapsed when the validity of these patents were attacked, and the Court held in these cases that these actions to nullify the patents issued were prescribed by the prescription of six years as set out by Act 62 of 1912.
In the instant case there is no attack made upon the patent. The State of Louisiana and the defendants in the petitory action admit the validity of the patent and that it covered originally the land described therein which according to the patent itself was marsh land subject to tidal overflow. The official map of Louisiana in existence at the time of the issuance of the patent also shows that this was actually land and not a bed of a stream or navigable water. The contention of the State is that conceding the validity of the patent the land was now eroded, washed away and been submerged by the sea and is no longer land and is actually a part of the bed of the Gulf of Mexico. This brings it under the rule laid down by the Supreme Court in the Miami Corporation v. State of Louisiana, supra. This case holds as follows:
“Since it is conceded that Grand Lake is a navigable body of water, and the law is settled that the title to the bed of such a body of water is vested in the State, the question arises whether the eroded or disputed area, which has been added to the bed of the lake by the combined forces of nature — subsidence and erosion — has so become a part of the bed of the lake, that it is now the property of the State, and the riparian proprietors have lost their title. It appears to be the rule that where the forces of nature — subsidence and erosion — have operated on the banks of a navigable body of water, regardless of whether it be a body of fresh water or the sea, or an arm of the sea, the submerged area becomes a portion of the bed and is insusceptible of private ownership. This is of necessity the law, because, to hold otherwise would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water.
* * * the rule is, that when submersion occurs, the submerged portion becomes a part of the bed or bottom of the navigable body of water in fact, and therefore the property of the State, by virtue of its inherent sovereignty, as a matter of law.”
We, therefore, conclude that plaintiff in the petitory action, Scott, has failed to carry *886 the burden of proof that the land in question had subsided and was the bed of the Gulf at the time the patent was issued. In spite of the fact that they put on some very interesting expert testimony to the effect that some uncertain part of the area might have been covered by water in 1883 this is not sufficient to carry the burden of proof and to overcome the-declarations made in the patent, that none of the land had subsided prior to 1883. The official plat shows that the area was a land area prior to the issuance of the patent, and there was no official plat in the year that patent was issued, and no evidence that a change had occurred between the date of the official plat and the date of the patent.
The presumption is that the land was in the same condition at the time of the issuance of the'patent as it was at the time of the last official survey.
Appellants urge that the State failed to prove when the land subsided. There can be no stronger proof than the stipulation of all parties that the land had washed away, subsided and been covered by water for more than six years before the present suit was filed.
For these reasons we concluded that the judgment of the Trial Court is correct, and judgment herein should be affirmed.
Affirmed.