61 So.2d 735

**STATE ex rel. TREADAWAY v. LOUISIANA STATE BOARD OF HEALTH.**

No. 40715.

Nov. 10, 1952.

George Piazza, New Orleans, for relator.

Edmond G. Miranne, George Sladovich, Jr., and Charles L. Stiffell, New Orleans, for respondent-appellant.

MOISE, Justice.

Mandamus proceedings were instituted by Grant T. Treadaway to compel the Louisiana State Board of Health to change its records as to relator's mother, Anna Treadaway, from "colored" to "white". The State Board of Health filed an answer in which it stood on all of the grounds covered by its certificate and pleaded that the registration was correct. The district court, after overruling exceptions filed by the defendant Board, held a trial on the merits and thereafter rendered judgment making peremptory the writ of mandamus. The State Board of Health prosecuted an appeal to this Court and we, in turn, referred the matter to the Court of Appeal for the Parish of Orleans, because of our lack of jurisdiction. 218 La. 752, 51 So.2d 41. The appellate court reversed the judgment of the district court and dismissed relator's suit. We granted a writ of certiorari and this matter is now before us for review.

We have examined the record, the testimony and the documentary evidence presented in this case, and, after careful

consideration, having satisfied ourselves that the Court of Appeal's conclusions on the law and the evidence are correct, we quote approvingly from its findings:

"The Treadaway family, of which Anna Lafitte Treadaway was the mother and Daniel Treadaway was the father, and of which Grant Treadaway was one of the sons, lived in St. Tammany Parish on the bank of Bayou Lacombe near its mouth where the father, Daniel Treadaway, followed his occupation as a trapper, hunter and fisherman, and as caretaker of the navigation light at the mouth of Bayou Lacombe.

"Both Daniel Treadaway and his wife, Anna, went to St. Tammany Parish from Plaquemines Parish, below New Orleans, and had lived in St. Tammany Parish for many years when, in 1930, the wife, Anna, died and the record, which is under attack, was made.

"The children were the relator, Grant, his brothers, William T., Peter Wiley, Joseph and Daniel Treadaway, Jr.

"The girls of the family were Anna (known as Darling), who married Louis Cazenave; Mary Lena, who married Joe D'Angelo; Marie, whose husband's last name was Melina, and Ebscobelle.

"When the mother, Anna Treadaway died on October 15th, 1930, her death was registered in the records of the Louisiana State Board of Health by the Registrar, E. G. Villarubia, and according to the certificate, the information given to the Registrar came from Joe Treadaway, a brother of the relator, and it is that certificate, in which the race of the mother, Anna, is entered as colored, which is under attack.

"From that certificate it is made to appear that the parents of the deceased, Anna Treadaway, were Joe Lafitte, the father, and Augustine, the mother. The last name of the mother is not given on the certificate, though it otherwise appears that the full name of the mother was Augustine Casborne.

"There is much contradictory evidence as to whether the deceased mother, Anna, had several brothers and sisters. According to some of the evidence relied on by the Board of Health, the brothers were John Lafitte; Fanny Lafitte, whose husband was Charles Ducre or Dupre; Patrick Lafitte; Benjamine Lafitte, whose husband was Manuel Cryer, and Thompson Lafitte, whose first wife was Victorine Cryer and whose second wife was Lumina Silve.

"There is nothing in the record to show the race of any of these persons except Thompson Lafitte, and it is the contention of the relator that Thomp-

son Lafitte was not a brother of relator's mother, Anna Lafitte. If Thompson Lafitte was a brother of Anna Lafitte, there are many certificates in the record showing the race of Thompson Lafitte as colored and showing also the race of many of his children as colored. And if Benjamine Lafitte was a member of the family of relator's mother, there is in the record a certificate showing the race of one of the children of Benjamine Lafitte as colored and showing that the mother of this child, Benjamine Lafitte, was herself colored. This certificate, recording the birth of Levine Cryer, shows her to be the female daughter of Manuel Cryer, the father, and 'Ben (Lafitte) Cryer', and it shows the race of the mother 'Ben (Lafitte) Cryer', who was obviously Benjamine Lafitte, as colored.

"We find it unnecessary to set forth the details concerning the certificates which appear under the name of Thompson Lafitte and of his several children. because the contention of relator as to them is that they are not related to him, and the contention of the Board of Health is that they are. If they are related to him, then these certificates constitute a tremendous volume of evidence contradictory to the contention of relator and if they are not so related then these certificates should be disregarded.

"We also find in the record a certificate showing the birth of 'Anestasia Casnave Cazenave'. This child, a girl, is shown on the certificate to be the daughter of Louis Caznave and Anna Treadaway. And in this certificate the race of the mother, Anna, is shown as 'color'. Anna Treadaway was unquestionably a sister of relator, Grant Treadaway.

"There is also in the record a certificate showing the birth of Andrew Cazenave. This male child is shown to be the child of Louis Cazenave and Anna Treadaway, the sister of relator, and the race of the mother of this child is shown as 'col'.

"Peter Wiley Treadaway, a brother of relator, admittedly married a colored woman named Dupre or Ducre. There are in the record several certificates showing births of children of Peter Wiley Treadaway. As we have said, it is conceded that his wife was colored, but in each of these certificates, of which we find in the record at least three, the race of the father, Peter Wiley Treadaway, is shown as colored. In one of the certificates, in the case of the birth of Leoma, the father's name is given as Peter Wiley Treadaway. There is an ink line drawn through the middle name 'Wiley' and above it is written 'Willy'.

"There is in the record a Family Office Record Card issued by the

Superintendent of Schools of St. Tammany Parish. This certificate lists five children of Daniel Treadaway. On this card there is a blank showing the letters 'W' and 'N' in which the race should be checked. There is a checkmark after the letter 'N'.

"Also in the record are certificates showing the birth of two children of this Daniel Treadaway. These two children are Sylvene Treadaway and Adele Treadaway. Sylvene Treadaway, according to the certificate, is shown to be the daughter of D. James Treadaway and Adele. Sylve, the mother. And according to the certificate the race of the father is given as 'Color'.

"The certificate showing the birth of Anevelle 'Treadway' shows her to be the daughter of Daniel J. 'Treadway' and Adele Sylve, and according to this certificate the race of the father is given as 'col.' D. James Treadaway and Daniel J. Treadaway are one and the same person and that person, according to relator, is his brother.

"We also find in the record a certificate showing the death of Encebelle Treadaway, a sister of relator. According to this certificate, this sister, Encebelle, was 'col.' The information on this certificate was given by Daniel Treadaway. We cannot tell whether the Daniel Treadaway who gave the information was the brother of Ence-

belle or the father of Encebelle, but in either event the informant was a blood relative of Encebelle and a blood relative of the relator. In this certificate it is true that the name of the mother of Encebelle is given as Hanna Fitte, whereas relator contends that his mother was Anna Lafitte and not Hanna Fitte.

"There are in the record several other certificates showing the deaths of several other Treadaways who lived in that area of Plaquemines Parish from which relator's father had migrated to St. Tammany Parish, and in practically all of those the race of the various persons named Treadaway was shown as colored. However, we are not concerned with the question of the race of relator's father, since on his death certificate his name is shown as white, and no effort has been made to change that entry.

"It is interesting to note that apparently relator realized that it was absolutely essential that he show that the father of his mother, Anna Lafitte, was not colored. The father was Joe Lafitte, and according to the testimony of the relator and some of his witnesses, Joe Lafitte was known as Lunchman Lafitte and was white. There seems to be no doubt that in St. Tammany Parish there was a Lansman Lafitte who, according to many

witnesses produced by the respondent, Board of Health, was colored.

"It is interesting also to note that though the race of relator's father is not at issue, relator took pains to attempt to show that the Thomas Jefferson Treadaway, who was his father's father and who had lived in Plaquemines Parish for many years, was not the same Thomas Jefferson Treadaway who had also lived in the same locality of Plaquemines Parish and who, according to much evidence in the record, was colored.

"There is in the record considerable oral testimony of many witnesses from the Parish of St. Tammany. Among the witnesses we find reputable citizens whose testimony is that they were familiar with the mother and the father of the relator and that they always considered them as white. On the other hand, other reputable citizens testified that they were also familiar with Daniel Treadaway and with his wife, Anna, and that they always considered them as colored.

"It is contended on behalf of relator that the question of his race was never raised until his family became involved in politics to some extent and refused to follow the wishes of the local politicians who have now testified that they always thought that relator's father and mother were colored.

"It is contended that the midwife who assisted at the births of several of the children and who herself was colored, was ignorant and could not read or write and therefore made a mistake in giving the information as to the race. We find, however, that in many instances the information according to the certificates was given by relatives of the relator and that the certificates were not based solely on the information given by the midwife.

"The record shows that the relator was called into military service during the Second World War and that he was registered as white; and that he served with white companions all through the war, was wounded, and was assigned to white hospitals. His record seems to have been most creditable.

"There are in the record several registration certificates issued in the Parish of St. Tammany showing the registration of Grant Treadaway as a voter in the Parish of St. Tammany, and it is contended that these could not have been issued had he not been white.

"It must be conceded, of course, that there is always the possibility that error may have been made, and it is of paramount importance, particularly in matters of this kind, that such errors be corrected.

1059 1060

"Our attention is directed to the opinion of the Supreme Court in Sunseri v. Cassagne, 191 La. 209, 185 So. 1, in which the registrar, who registered the death shown on the certificate in this case, was the same registrar whose entries were under attack in that case. In the Sunseri case the Supreme Court ordered the matter remanded for further evidence touching upon the correctness or incorrectness of those entries. When the matter again came before the Supreme Court, that Court approved the action of the district court in admitting evidence to show that the original entries should have shown the race of the persons involved as colored. See Sunseri v. Cassagne, 195 La. 19, 196 So. 7."

The relator contends that the appellate court cannot reverse the judgment of the district court unless there is shown manifest error, because, the rule is, the district judge seeing and hearing the witnesses is in a better position to judge of their credibility. The statement of fact in the appellate court's decision is predicated in the main on documentary evidence registered at an unsuspicious time and thereafter persisted in under different recorders. The certificates of registration show that the information given was on documentary evidence of prior registrations by members of the relator's family. On such evidence, the district court is in no better position to judge than the appellate court.

The relator further contends that it is the duty of the State Board of Health to establish beyond a reasonable doubt that relator's mother was colored.

Relator must show that he has a clear legal right to have the correction made. The legal certainty of the proof submitted must be such as to compel the Registrar of Vital Statistics to perform the ministerial duty of changing the recordation from "Colored" to "White". The proof of record falls far short of any such assumption. As the name indicates, the records kept by the Registrar are vital to the general public welfare. The registration of a birthright must be given as much sanctity in the law as the registration of a property right.

The writ heretofore issued is recalled and set aside, and the judgment of the Court of Appeal, Parish of Orleans, dismissing relator's suit, is affirmed at relator's cost.