88 So.2d 76 (1956)
Robert GREEN
v.
CITY OF NEW ORLEANS (Department of Public Health).
No. 20696.
Court of Appeal of Louisiana, Orleans.
June 11, 1956.
Rehearing Denied June 27, 1956.
Writ of Certiorari Denied September 28, 1956.
*77 Burton G. Klein, New Orleans, for plaintiff-appellant.
Henry B. Curtis and John F. Connolly, New Orleans, for City of New Orleans, defendant-appellee.
Frank J. Stich, Jr., New Orleans, curator ad hoc.
REGAN, Judge.
Plaintiff, Robert Green, a colored adoptive applicant, instituted this suit against the defendant, City of New Orleans, Bureau of Vital Statistics, endeavoring to obtain a writ of mandamus compelling the defendant to change the race, as revealed in the birth certificate of Jacqueline Ann Henley, age about four and a half years, from white to colored or to show cause why such change should not be made; plaintiff then requested that a curator ad hoc be appointed by the court to represent the interest of the minor child.
No answer appears in the record on behalf of the Bureau of Vital Statistics, however, Frank J. Stich, Jr., the curator ad hoc answered and generally denied the pertinent allegations of plaintiff's petition.
From a judgment in favor of defendant dismissing plaintiff's suit, he has prosecuted this appeal.
The chronological facts are relatively simple. On November 2nd, 1950, Ruby Henley Preuc[1], a white woman gave birth to a female child, Jacqueline Ann Henley[2] while confined in the Charity Hospital of New Orleans. Three weeks after the birth of the child Ruby Preuc brought it to the home of her sister, Mrs. Harold McBride. The identity of the child's father was never revealed to anyone by its mother and, therefore, he is, at present, unknown. On October 11, 1952, Ruby Preuc died of a brain tumor in the Home for Incurables, where she had been confined since shortly after the birth of her child. On August 1, 1952, Mrs. McBride visited the Department of Welfare and requested it to accept the child as she felt that it was a Negro and she could no longer permit her to remain in her home, since the neighbors were beginning to comment about the medium brown color of the child's skin. In order to facilitate this request proceedings were initiated wherein the child was declared abandoned by the Juvenile Court for the Parish of Orleans and, on October 1, 1952, it was placed in a Negro foster home where she has remained.
Plaintiff endeavored to adopt the child through the use of the facilities of the Department of Welfare, which approved his application, but an examination of the child's birth certificate disclosed an impediment in that she was registered as white in the Bureau of Vital Statistics, and that agency refused to change the designation of the race of the child to colored. Hence this suit.
*78 The only question posed for our consideration is one of fact and that is whether Jacqueline Ann Henley has been proven to be a member of the Negro race?
Plaintiff contends that the lower court erred in its judgment, for the reason that sufficient evidence was offered during the trial hereof to prove that the child was a Negro. On the other hand, the curator ad hoc insists that the evidence adduced at the trial was not sufficient to compel the Bureau of Vital Statistics to change the birth certificate of the child from white to that of a colored person.
We feel compelled to remark at the inception of this opinion that we were completely fascinated by the novel-like tenor of this record. The trial judge, apparently in order to afford the plaintiff the benefit of every doubt and an unimpeded opportunity to prove his case with that legal certainty which the law requires, most liberally relaxed the rules of evidence, therefore, much of the testimony that we shall refer to or quote hereinafter, insofar as plaintiff's case is concerned, will, we believe, be predicated, to a large extent, on hearsay, inferences and presumptions of fact.
Counsel for plaintiff in order to sustain his client's contention that sufficient evidence was adduced in the trial court to prove that the child was, at least, part Negro, points to the testimony of Herbert Stanton, a Negro laborer, who related that Ruby Preuc was employed as a barmaid in a Negro saloon, a fact which everyone seems to have conceded. He further asserted that he corresponded with Ruby Preuc when she was visiting her sister in Detroit, Michigan. A letter was offered in evidence written, during this time, by Stanton to Ruby Preuc and it contained such phrases as "but you know that I'll always love you"; "I wish you was home I miss you so" and "with love, Rock[3]." On Direct and cross examination he further related that he had never "gone out" with her nor had he been "intimate with her" and upon being interrogated "Did you ever meet her after work ?", he responded "* * * her boss used to bring her home * * * a white man."
Counsel conceded in oral argument that the testimony of Stanton and the letter were not offered to prove parentage, but merely to show Ruby Preuc's close association with Negroes.
Plaintiff offered in evidence the testimony of Mrs. Emma Smith,[4] who related that birth certificates were her special assignment and that it was she who had prepared the child's birth record. Upon being interrogated "The color and race of the father, do you ask that question?", she responded, "No, if she is a white mother. We do not ask if her husband is white, we take it for granted he is white." The certificate that Mrs. Smith prepares ultimately becomes the actual birth record and for that purpose it is forwarded to the Department of Public Health, a fact which was admitted by Mrs. Naomi Drake, Deputy Registrar of the Bureau of Vital Statistics for the City of New Orleans.
Mrs. Harold McBride, sister of Ruby Preuc, testified that three weeks after the birth of the baby, Ruby Preuc and the child came to her home, wherein Ruby resided until she was removed to the Home for Incurables, where she subsequently died. Sometime after Ruby Preuc was confined in the Home for Incurables and about two months before she died, Mrs. McBride visited the Department of Public Welfare and requested it to accept the child because "she didn't fit in my family, she was too dark. * * * I told Mrs. Oberholtzer[5] there had been remarks passed that the child possibly was a nigger." However, Mrs. McBride, both on direct and cross examination, related that she had never seen her sister consort with Negroes "outside of work" and that she did not actually know if the child was part Negro.
*79 Mrs. Catherine Oberholtzer testified that Mrs. McBride, when she visited her, stated that "she would like the agency to make plans for the child since she felt that she was a Negro and she could no longer keep her in the house; the child was growing darker day by day."
Charles Collins[6] testified that when Mrs. McBride visited his office she informed him that "* * * she lived in an all white neighborhood and that it would sooner or later be embarrassing * * * to have the child in her household. * * * because of its color."
The only expert witness offered to enlighten the court appeared on behalf of the plaintiff and it is on his testimony that plaintiff rests his case. Dr. Arden R. King stated that he was a professor of Anthropology at Tulane University and had done graduate work in physical anthropology and archeology. He related that the child was four and a half years of age at the time of his examination to determine if there was any possibility that she was part Negro. He testified at great length on two occasions and, in the final analysis, more briefly summarized what he had previously asserted:
"There are three characteristics which are distinctly Negro in this child. One is the lip seam, the division between the integumental lip, the skin lip above here, and the mucous lip, is clearly marked, the little ridge; and secondly, the distinctly small, delicate ears; and third, perhaps the most indicative of all, there are concentrations of pigments in diagnostic positions of the anatomy.
"While I could get these three characteristics occurring in an individual who had no Negro ancestry, it would be so rare  we have records of it  it would be so rare as not to be considered at all probable."
Upon being interrogated "* * * could you say positively there was some degree of Negro blood less than one-fourth, no matter how small?", he responded "* * * you ask me to not be scientific, and I can not. I won't go beyond saying extremely probable." Dr. King concluded by asserting that if this child was nine or ten years old he would then be in a more advantageous position to determine its race.
The curator ad hoc insists that the foregoing evidence is not sufficient to compel the Bureau of Vital Statistics to change the birth certificate of the child from white to that of a colored person and, therefore, requests that the judgment refusing the writ of mandamus be affirmed.
The trial judge obviously was of the opinion that the plaintiff had failed to prove his case with that legal certainty which the law requires in cases of this nature and our examination of the record fails to disclose any error in his factual or legal conclusions. The testimony of Stanton was not offered by plaintiff to prove parentage, but merely to show Ruby Preuc's close association with a Negro or Negroes. The inference, of course, which plaintiff desired to create by virtue of Stanton's testimony was intimacy sufficient to create a presumption of fatherhood.
The testimony of Mrs. Emma Smith likewise was not offered to prove parentage, but to create a presumption of negligence in the Charity Hospital in failing to diligently endeavor to ascertain the race of the newborn infant before issuance of the birth certificate to the Bureau of Vital Statistics, which accepts it as such at face value.
Mrs. McBride's opinion of the race of the child, unsupported by evidence other than appears herein, certainly was not proof thereof.
As we have related hereinabove, in the last analysis, plaintiff rests his case on the testimony of Dr. Arden R. King, who qualified as an expert in the field of anthropology, which the record informs us is the science of man in relation to physical character, distribution, origin, classification and relationship of races. As we have seen, the very utmost that Dr. King could say with *80 respect to this child being part Negro was that "this was an extreme probability."
It is well recognized that anthropology is an inexact science and, therefore, Dr. King could not say with certainty that the child was part Negro and that this uncertainty was accentuated by the tender age of the child. We believe that it is also well recognized that all the methods presently in use to determine race are precarious and that their provisional findings must be accepted with the utmost caution.
The general rule that a civil case need not be proven beyond a reasonable doubt is conceded, but we know of no case wherein the courts have applied this general rule when the purpose was to change the race of a person as disclosed in a birth or death certificate.
In the relatively recent case of State ex rel. Treadaway v. Louisiana State Board of Health, on rehearing, La.App.1952, 56 So.2d 249, 250, we said "there must be no doubt at all", and the following extract therefrom serves to point up the reason for this assertion:
"In Villa v. Lacoste, 213 La. 654, 35 So.2d 419, 421, the Supreme Court, in discussing the effect of a certificate issued by the State Board of Health, said clearly that such certificates constitute only prima facie proof of the correctness of the statements contained therein and held that such evidence as was introduced had been `ample to overcome the prima facie case' made by the certificates themselves.
"We wondered whether we had accorded too great an effect to the certificate under attack here.
"In Sunseri v. Cassagne, 191 La. 209, 185 So. 1, 5, the Supreme Court, in another somewhat similar matter, held that a person who has been commonly accepted as being of the Caucasian race should not be held to be of the colored race `unless all the evidence adduced leaves no room for doubt that such is the case.'

"The Supreme Court remanded the matter in order that further evidence might be adduced and finally held that there was no doubt, and maintained the correctness of the certificates which were there involved and which showed the defendant to be colored.
"We wondered whether the evidence here left no room for doubt.
"Thoroughly aware of the transcendent importance of our conclusion to those involved and to others affected though not parties, we diligently endeavored to convince ourselves that there might be room for doubt.
"We interpret the language used in the Sunseri case and quoted above as indicating that the proof in such case should be even more convincing than that which is necessary in such cases as must be proved `beyond a reasonable doubt.' We feel that the language used by the Supreme Court means that there must be no doubt at all.

"However, as the Supreme Court found itself compelled to do when the Sunseri case was presented to it finally, Sunseri v. Cassagne, 195 La. 19, 196 So. 7, 9, we must hold that the evidence here leaves no room for doubt and that the certificate under attack should not be changed." (Italics ours.)
The Supreme Court granted a writ of certiorari in the foregoing case, 221 La. 1048, 61 So.2d 735, 739, and having satisfied themselves that this court's conclusions with respect to the facts and the law were correct, adopted the opinion of this court and, in the concluding paragraph of its opinion, asserted:
"Relator must show that he has a clear legal right to have the correction made. The legal certainty of the proof submitted must be such as to compel the Registrar of Vital Statistics to perform the ministerial duty of changing the recordation from `Colored' to `White'. The proof of record falls far short of any such assumption. As the name indicates, the records kept *81 by the Registrar are vital to the general public welfare. The registration of a birthright must be given as much sanctity in the law as the registration of a property right."

In view of the unequivocal rationale expressed in the foregoing cases we must entertain the opinion that the evidence adduced herein is not sufficient to compel the Bureau of Vital Statistics to change the birth certificate of the child from white to Negro at the present time. The final cause of law is the welfare of society. The rule that misses this aim cannot permanently justify its existence. The above jurisprudence is predicated on that major premise.
We notice that the trial court inadvertently dismissed plaintiff's suit. We believe that plaintiff should have been nonsuited by virtue of the fact that the testimony of the expert Dr. King revealed that when the child was more developed and mature, he would then occupy an excellent position to testify with greater certainty as to its race.
For the reasons assigned the judgment appealed from is amended by dismissing the plaintiff's case as of non-suit and, as thus amended, it is affirmed.
Amended and affirmed.
JANVIER, Judge (dissenting).
I do not retract one syllable of what was said in State ex rel. Treadaway v. State Board of Health, La.App., 56, So.2d 249,250, and I agree that, as we said there, the language used by the Supreme Court in Sunseri v. Cassagne, 191 La. 209, 185 So. 1, should be interpreted as meaning that in practically all such cases vital statistics records should not be ordered changed unless there is "no doubt at all" of the incorrectness of those records. Nor do I to any extent criticize my associates who feel that the record here leaves some possible doubt on the question of whether the little girl is a Negress.
There is a vast distinction between the facts of this case and the facts found in practically all other cases in which an effort has been made to force a change in such records. The distinction lies in the fact that here, at the very outset of our investigation, we find that the entry showing the race was made as the result of a presumption and not because of a stated fact.
In practically all cases the information as to the race, etc., is given by a member of the family and is based on knowledge or at least on a well founded belief as to the race of the parents. Here the record shows that no one gave any information as to the race of the father of the child and its race was stated as white merely because of the custom in the hospital that where a white mother gives birth to a child and there is no knowledge as to who is the father it is "presumed" that the father is white. The entry on the record of the Board of Health was made from information given by the hospital, which information was not based on knowledge but merely on the referred to presumption.
We know that the father was not white or Caucasian because on that point the anthropologist to whom I shall later refer says that he has no doubt at all. His only possible doubt was as to whether the race of the father might be something other than Negro though, as I will show hereafter, he found Negro characteristics and did not find any other characteristics. We start then with a record which we know is incorrect. I myself feel that there is no doubt at all and, being without doubt that the father was a Negro, I cannot permit myself to consent to a decree which must have a most harmful effect on the welfare of the little girl and to some extent on the public welfare as well.
There is no doubt in my mind that every person who has come into contact with this record really has no doubt at all that the little girl in question is a Negress. First of all, we notice that the aunt of the little girl (the sister of the mother) found it necessary to give up the custody of the child because *82 she fully realized that it was a Negress. She so stated to at least two persons. Then the Welfare Association had no doubt at all of the race of the child and made arrangements for its adoption by a Negro family and only then discovered that its race had been registered as "white".
We come to the adoptive family and find that there is no doubt at all as to the race and this is evidenced by the attempt to force a change of the records so that it might be adopted as a Negro.
In my opinion there is no doubt in the mind of Dr. King, the Professor of Anthropology at Tulane University. He said that the father of the child was of other than the white race and that the only characteristics other than Caucasian which he could possibly identify were those of the Negro race, and that in his opinion the father was of the Negro race, but, when pressed as to whether he could positively say that there was no doubt at all, he merely said that personally he believed it, but that as a scientist he realized that there was the possibility of error from a scientific point of view and that therefore he could not say that, from that point of view, there was no doubt at all.
A person of the Negro race has as much right to have such records correctly made as a person of the white race. And I cannot condemn this little girl to the humiliation and embarrassment which must ensue if this incorrect entry is to stand even for the five or six years suggested by my associates. There is no assurance that after the lapse of those five or six years another effort will be made to effect the necessary correction, and there will result the most unfortunate situation that the little girl registered as white will continue to associate with Negroes and that her social life will be only with Negroes and yet she will be unable to marry a Negro since, being registered as a white person, miscegenation laws will make such a marriage impossible. In fact, during the five or six years suggested by my associates she will labor under the embarrassment of associating socially only with Negroes who will no doubt taunt her with being registered as "white".
The record convinces me that she is of the Negro race and that we should so declare.
I respectfully dissent.
NOTES
[1] Divorced by Harry Preuc on January 5, 1949, in the State of Kansas.
[2] Henley was the mother's maiden name.
[3] Herbert Stanton's nickname.
[4] An employee of the Medical Record Library of Charity Hospital.
[5] An employee of the Department of Public Welfare.
[6] An attorney for the Civil Division of the Legal Aid Bureau.