SAMUEL, Judge.
Relator seeks to enjoin the Deputy Registrar of the Bureau of Vital Statistics for the City of New Orleans: (1) from placing the racial designation “Negro” or “Colored” upon relator’s birth registration, and (2) from placing such racial designation on records pertaining to members of relator’s family (whose registrations directly affect relator). Additionally, in the event any such changes already have been made by respondent, relator asks that respondent be ordered to restore such changed records to their original condition. Relator has appealed from a final judgment dismissing his suit on the merits.
Relator’s father, Eugene Louis Heno, died in July, 1962. A certificate of death, showing decedent’s race to be “White”, was presented for registration with respondent. Some time thereafter respondent notified relator of her intention, based on certain evidence in her possession, to change the racial designation on that death certificate to “Negro” unless petitioner could present sufficient evidence to dissuade her. The evidence presented was deemed unsatisfactory by respondent and she advised relator she proposed to change that death certificate, relator’s birth certificate and several other certificates under her control to show relator and other members of his family to be negroes. This suit for injunc-tive relief followed.
The law under which respondent proposed to act is LSA-R.S. 40:266, which reads as follows:
“No certificate or record on file in the local registrar’s office shall be altered except upon submission of sufficient documentary or sworn evidence acceptable as a basis of the alteration.”
This statute was interpreted in State ex rel. Estelle Rodi v. City of New Orleans, 94 So.2d 108, 113, where this court stated the rule “that a change in such a registration should not be made unless the proof is so overwhelming as to justify the conclusion *227 that there is practically no doubt at all.” The court (at page 114), in finding the evidence sufficient to support a change in that case, observed that it “left no reasonable doubt in the minds of the officials as to the race”, and indeed found (at page 116) “that there is no doubt at all”. Again, in State ex rel. Treadaway v. Louisiana State Board of Health, 56 So.2d 249, affirmed, 221 La. 1048, 61 So.2d 735, this court noted the rule of Sunseri v. Cassagne, 191 La. 209, 185 So. 1, that “a person who has been commonly accepted as being of the Caucasian race should not be held to be of the colored race ‘unless all the evidence adduced leaves no room for doubt that such is the case.’ ” The court added (at page 250 of 56 So.2d) : “We interpret the language used in the Sunseri case and quoted above as indicating that the proof in such case should be even more convincing than that which is necessary in such cases as must be proved ‘beyond a reasonable doubt.’ We feel that the language used by the Supreme Court means that there must be no doubt at all.”
The question presented in this case is whether the evidence in respondent’s possession, considered with the contrary evidence supplied by relator, i.e., all the evidence contained in the record before us, is sufficient to bring this case within the exception to the general rule of R.S. 40:266 prohibiting alterations; or, in other words, whether the evidence leaves “practically no doubt at all”, or “no doubt at all”, that the correct racial designation for the records here involved is “Negro” or “Colored”.
Respondent’s evidence claimed to support the alteration consisted, as presented in court, of certified photostats, listed here in chronological order, of: (1) Birth certificate of Clothilde Mary Heno,' relator’s father’s sister. This certificate was executed in the form of a declaration by Adolphe Heno, relator’s paternal grandfather on July 5, 1882. It bears, next to the child’s name, the notation “Colored” in ink which appears in the photostatic copy to be darker than, and in a handwriting apparently different from the balance of the certificate; (2) Death certificate of the same child. This certificate was executed by one Ovide Maurice on July 6, 1882 (the day following the registration of the birth). It bears the notation “Col.”, again in a hand that appears, especially in the capital “C”, different from the balance of the certificate, particularly the “C” of “Clothilde” and of “Cholera”, stated as the cause of death that day. (Other samples of the “C” employed in filling in the rest of the certificate are found in the previous day’s birth certificate, in “Clothilde”, “Cor. Hancock and Royal”, and “this City”) ; (3) Death certificate of Louise Kinta Heno, another sister of relator’s father. This certificate was executed by P. J. Schoen, undertaker, on January 27, 1906. It bears a notation which appears to be “Colored”, with the word Colored written over what appears to have been “White”, although the photostat is not perfectly clear; (4) Death certificate of Adolphe J. Heno, relator’s paternal grandfather. This certificate-was executed by A. Provenzano, of 831 Elysian Fields, on January 27, 1912. It bears the notation “Col.”, in a hand which appears to be neither clearly the same, nor clearly different from, that which executed the balance of the certificate; and (5) Other vital records and genealogical charts based thereon showing relator’s relationship to the parties described in the certificates listed above. Included among these certificates is the death record of relator’s father, which has been altered by respondent to designate him “Negro”, with the notation that the change was made under R.S. 40:266 on the basis of some of the certificates listed above.
Prior to the 1942 law (§ 1, Act 181 of 1942, now contained in LSA-R.S. 40:266) which for the first time authorized extrajudicial alterations, such alterations were illegal, Sunseri v. Cassagne, 195 La. 19, 196 So. 7, 8 (1940), and such illegal alterations cannot claim the status of “prima facie proof” of their recitals, which LSA-R.S. 40:159, subd. B otherwise would afford. But by another rule of the Sunseri case, *228 if the grandfather was colored, then all of his descendants are legally classified as colored, since they would all have a traceable amount of colored blood. The death certificate of Adolphe J. Heno, considered by itself and assuming that its “Col.” notation was part of the original certificate, therefore would justify respondent’s proposed action under the rule of Sunseri, were there no contrary evidence.
There is no birth certificate for Adolphe, nor any certificates for his parents or other ancestors. Adolphe, according to the census records, was born in August, 18S0. Act 104 of 1846 expressly provided “no person shall be under any legal obligation to have a birth or death recorded”, and it may well be that Adolphe’s birth was never recorded. Prior to 1846 the only statutory obligation was that imposed upon the various Parish Recorders (and in Orleans the office of Records of Births and Deaths) to receive declarations of births and deaths. See Act of Territory of Orleans, April 10, 1811. It was long after Adolphe’s birth that Act 80 of 1877, Ex. Sess., made the reporting of births mandatory; and by Act 162 of 1900 physicians and midwives outside of Orleans were required to file a quarterly record of births and deaths.
Although the death certificate shows the race as Col., there is contrary evidence. Apart from the evidence which shows that Adolphe and his family considered themselves and were considered by all others as white, there is evidence which shows that Adolphe was buried in Metairie Cemetery, which has never knowingly permitted the burial of colored persons; that Metairie Cemetery permitted the undertaker A. Pro-venzano, of 831 Elysian Fields Avenue, to conduct funerals in that white cemetery, from which the inference is inescapable that A. Provenzano’s funeral home was a white funeral home (which, as shown by Adolphe’s wife’s death certificate, also conducted the funeral in 1916 of Adolphe’s wife, whose death was registered as white, and also buried her in Metairie Cemetery). This evidence is very persuasive (even if not conclusive), not that Adolphe J. Heno could not have been colored, but that A. Pro-venzano, the white funeral home official who executed the death certificate and buried him in an exclusively white cemetery, could not have believed that Adolphe was colored, and therefore would not have executed a certificate reciting that Adolphe was colored. Even if Provenzano suspected that Adolphe was colored, it seems highly improbable he would have executed a certificate to that effect, especially in view of the obvious unfavorable business consequences which could flow from such an act.
Thus we believe it altogether unlikely (even if not impossible) that Adolphe’s death certificate as originally registered showed him to have been colored. To this reasoning we add the circumstances (1) that the designation “Colored” was apparently placed upon Adolphe’s daughter Clothilde’s birth certificate after its execution; (2) that the designation “Colored” was obviously written over something else — something that, it appears, may have been “White”— on Adolphe’s daughter Louise’s death certificate ; and (3) that the designation “Col.” was placed upon Adolphe’s daughter Clo-thilde’s death certificate apparently by a different hand from the one which executed the original certificate. The previously deduced probability that Adolphe’s own death certificate as originally executed did not bear the designation “Col.” is thus increased by the circumstances of the alteration, perhaps illegal, of these other certificates.
Consequently, as between on the one hand the improbable possibility that a white undertaker executed Adolphe’s death certificate as “Col.” (and thus knowingly accepted a colored corpse in his white funeral home and buried it in a white cemetery), and on the other hand the possibility — apparently a reality as to the certificates of his daughters —that Adolphe’s death certificate was altered, we are unable to exclude the possibility that Adolphe’s original death certificate did not show him to be colored, but was altered at some later time, also perhaps illegally, by some unknown hand.
*229 Excepting only his death certificate, there is no other evidence whatsoever in the record to suggest that Adolphe was colored. On the contrary, all the other evidence tends to prove simply that Adolphe considered and claimed himself to be white, and was considered and accepted as white in all quarters. Without detailing all this evidence, we believe it appropriate to recite that he was married in 1870 in a church which ordinarily marked its records of colored marriages to show that the parties were colored, and yet Adolphe’s wedding record is not so marked. In the 1880 census, and again in 1900, he reported himself to the census taker as white. In 1882 his daughter Clothilde was buried from St. Louis Cathedral, and the Cathedral’s record, which otherwise reflects the same description of the child and cause of death, certified by the same doctor, as on the death certificate, shows her to have been “White”. Adolphe’s children were married in white churches and attended white schools. Adolphe himself lived in white neighborhoods, and was elected Justice of the Peace for the Second Ward of St. Bernard Parish on April 17, 1888 (as shown by extract of the Secretary of State’s records), in the same election which, we take notice, gave democrat Francis T. Nicholls a 118,000 to 38,000 victory for the governorship over incumbent reconstruction governor Henry Clay Warmoth.
On this record, we could not reach any other conclusion than that Adolphe J. Heno both claimed to be white and was considered white in the community; and the same can be said of all his descendants concerning whom there is any evidence whatever in the record. There is, except for the certificates discussed above, no evidence to the contrary.
This case therefore presents an altogether different situation from the cases to which we are referred by counsel.
In State ex rel. Treadaway v. Louisiana State Board of Health, 54 So.2d 343, 56 So.2d 249 ; 221 La. 1048, 61 So.2d 735, relator sought to change “Colored” to “White” on his mother’s death certificate. Relator’s brother had given the information that the mother was colored for the death certificate; and on nine other certificates, on several if not all of which informants were members of relator’s family, relator’s siblings were shown as colored. The court there emphasized that relator’s family itself had declared its various members colored, and held that relator’s proof fell far short of compelling any change.
In State ex. rel. Estelle Rodi v. City of New Orleans, 94 So.2d 108, relator sought to reverse respondent’s change of relator’s father’s death certificate from white to colored. The father’s brother’s death certificate showed him to be colored, and the brother’s child’s birth certificate showed him to be colored; the brother himself, the evidence indicated, was considered colored. Relator’s siblings’ birth certificates, executed by midwives related to the family, showed the father to be colored. The testimony of witnesses was largely that the father was considered colored, although there was some evidence that he was considered white. This case, then, was another case in which members of the family executed certificates declaring their relatives colored.
Sunseri v. Cassagne, 191 La. 209, 185 So. 1 (1938); 195 La. 19, 196 So. 7 (1940), was a suit to annul a marriage as miscegenous. In the first opinion in that case there was considerable dispute as to whether defendant’s great-great-grandmother, a “free woman of color”, was Negro or Indian, and the case was remanded for further evidence as to whether defendant’s own birth certificate, which purported to be signed by her mother, and the marriage certificates of two maternal aunts, correctly reflected the facts in showing, as they did, defendant and her aunts to be colored. On remand, defendant’s mother (a great-granddaughter of the “free woman of color”) denied that she had signed her daughter’s birth certificate, but the lower court stated it did not place much credence in her testimony. Other evidence did show that the aunts’ marriage *230 certificates, as originally issued to them, showed them to be of the Caucasian race. (And it was in relation to the alteration of these certificates that the Supreme Court observed, speaking prior to the 1942 amendment of what is now R.S. 40:266, that the registrar “did not have the right to change or alter the certificates even though the information upon which he relied was correct”.) However, other evidence on the remand of the case included that of a physician who had attended defendant’s maternal grandparents and a maternal great uncle, to the effect that they were colored, considered themselves to be colored, and were considered by everyone else to be colored. And a son of that great uncle testified the great uncle was a Negro, and that defendant’s mother and maternal aunts (the witness’s first cousins once removed) were members of the colored or Negro race. Thus in the Sunseri case also, there was, as a minimum, evidence from one relative declaring the fact of Negro descent; and there was further a birth certificate which purported to be, and apparently was believed by the court to be, signed by defendant’s own mother, reciting that defendant was colored.
In the first opinion in Sunseri, explaining the necessity for a remand, the Supreme Court declared, at 185 So. 5, “in view of the overwhelming testimony that she (i.e., defendant herself) and her immediate associates have always been regarded as members of the white race and have associated with persons of that race”, defendant could not be held to be “a member of the Negro race unless all the evidence adduced leaves no room for doubt that such is the case.”
In Green v. City of New Orleans, La.App., 88 So.2d 76 this court refused to order a change from white to colored in the birth certificate of the child of a white mother by an unknown father, although an expert anthropologist testified in detail that it was “extremely probable” the child was, through the unknown father, of Negro ancestry. The white mother had died without giving any hint as to the identity of the father, but she had been working as a barmaid in a colored bar. Her sister had finally felt compelled to surrender the child to an adoption agency because the child appeared to be of Negro descent. Nevertheless, applying the “no room for doubt” rule of Sunseri, we determined there was room for doubt, and therefore refused the change, because “the very utmost that Dr. King (the anthropologist) could say with respect to this child being part Negro was that ‘this was an extreme probability.’ ”
In the matter presently before us, to say merely that there is room for doubt that relator is a member of the Negro race would be an inadequate understatement. Except for the death certificate of Adolphe Heno, there is no room for anything but doubt on that proposition; and even as to the integrity of Adolphe’s death certificate there is room for doubt.
We believe, however, that the cloud cast over relator’s race deserves a clear repudiation if it deserves any repudiation at all. Therefore, we prefer to remand this matter to the district judge charging him, in addition to hearing any other pertinent evidence which may be offered by the litigants, to inspect the original records as follows: (1) death certificate of Adolphe J. Heno, died January 27, 1912, to determine, by comparison with the race designations on other certificates in the same book of records within several pages of this certificate, whether Adolphe’s race designation was made at the same time and by the same hand and in the same manner as other such notations; (2) birth certificate of Clo-thilde Mary Heno recorded July 5, 1882, to determine whether the notation “Colored” was made at the same time and by the same hand as that of the balance of the certificate, particular attention being given to whether that notation followed an erasure of any other notation; (3) death certificate of Clothilde Mary Heno died July 6, 1882, to determine, by comparison with the race designations on other certificates in the same book of records within several pages of this certificate, whether Clothilde’s race *231 designation was made at the same time and by the same hand and in the same manner as other such notations, particular attention being paid to the “C” of “Col.” ; and; (4) death certificate of Louise Kinta Heno dated January 27, 1906, to determine whether colored is written over white or other designation. For purposes of any further appeals, other certificates compared with items 1 and 3 should be photocopied and introduced into evidence.
Accordingly, the judgment appealed from is set aside and the case is remanded to the trial court for further proceedings in accordance with law and in conformity with the views expressed herein; all costs to await a final determination.
Set aside and remanded.