CHASEZ, Judge.
Relator, Louise Cousin Pritchard, brought this action in mandamus to compel the Louisana State Board of Health, through its president, Dr. T. N. Armistead, to correct her birth certificate, which designates her as “COLORED”, to reflect that she is a member of the white race.
The defendant responded and refused to comply with the plaintiff’s demand. After a trial, the Court below rendered judgment dismissing the demand of the relator and recalling the writs of mandamus, and the relator appeals to this Court.
We take it as established that the relator “has lived as a white person and has been accepted as such by the community in which she lives” as alleged in her petition.
The documentary evidence offered on behalf of the plaintiff consisted of the following: the death certificate of her mother, Irene Sophie Cousin, with her color stated as “White”; a baptismal certificate of the Sacred Heart Church in Lacombe, Louisiana, of her father, Garland Alexander Cousin, who is recorded as “White”; a marriage record of the same church pertaining to the parents of Garland Cousin who are recorded as “White”. They are identified as James Cousin, the son of John Wanee Cousin and Elisa Millón and Cassilia Cousin, daughter of Octave Cousin and Cas-silia Cousin. It is stated that James and Cassilia have received “a dispensation for consanguinity in the second degree collateral”. The sister of Garland Cousin, Remelia Cousin Riviere, is represented by a death certificate, “White”; Warren Cousin, a maternal uncle, is “White” on a death certificate; Joseph Pat Cousin, the maternal grandfather of relator, is “White” on a certificate of death; Louisa Duplantier (or Duplantis) Cousin, the maternal grandmother of relator, is “White” on a certificate of death, by virtue of a court order in suit No. 382-748, Civil District Court for the Parish of Orleans (1960) styled State ex rel. Lena Cousin Charbeck v. State Board of Health, through its president, Doctor W. J. Rein. Lena Cousin Charbeck is a maternal aunt of the relator. Also offered in evidence on behalf of the relator was a death certificate of her brother, George Anthony Cousin, classifying him as “White”; the record in the above mentioned suit 382-748, and the record in suit 366-674, Civil District Court for the Parish of Orleans (1958), styled State ex rel. Ernest Chabreck et ais. v. State Board of Health, through its president, W. J. Rein. Neither of those cases were appealed, and in both judgment was rendered in favor of the relators. We do not have the evidence which was presented in those cases before us, except some of the documentary evidence on behalf of the relators in suit No. 366-674 which was apparently placed into this record by counsel for the relator in this case, who was also the counsel for the relator in the above mentioned suits.
The Board of Health’s evidence consisted of the following: the relator’s birth certificate indicates her mother and father as “Colored”, as do the birth certificates of four of her siblings; three of them were prematurely bom, whose death certificates indicate them as “Colored”. A fifth sister’s birth certificate indicates the father, Garland, as “Colored” with no color designation for the mother; another sister, Dolores, is registered by a birth certificate indicating *492 the parents to be “White”; the only certificate on relator’s brother, George Anthony is the “White” death certificate mentioned previously. Similarly, the relator’s mother’s death certificate is the only document pertaining to her (incidentally, as best as we can make out, “Castillian Duplantier” is marked as Irene Cousin’s mother, but this appears to be in error as both parties admit that Louisa or Louise Duplantier, or Du-plantis, is the grandmother of relator).
Aside from the previously discussed certificate of Warren, the siblings of Irene Cousin, (Beverly, Harold Anthony and John) are “White” on delayed birth certificates ; Lena Cousin, the relator in suit 382-748, is also “white” on a delayed birth certificate.
The relator’s maternal grandmother, daughter of Louis Duplantier, and Octavia (what appears to be) Costanel of New Orleans, is “White” on a death certificate altered as a result of suit No. 382-748.
At this point, the documentary evidence becomes hazy. There is a New Orleans death certificate, dated October 26, 1916, of Louis Duplantier, 36 years old at the time and unmarried, designated “Colored”; there are also a New Orleans birth and death > certificate of a nine-month old “Colored” child, Ethel Duplantier, issue of Guy Du-plantier and Edna Martinez, who died in 1916; there is also a marriage license and marriage certificate pertaining to Placide Suane and Alice Allard Duplantier, the latter being the daughter of Louis Duplan-tier and Octavia Costanel, but there is no color designation; their child Lelia is designated “Colored” on her birth certificate; so too for Remy, another child of Placide and Alice Suane; there is a death certificate on Louis Duplantier, who died at 43 years in 1889, and is “Colored”. From the foregoing on the Duplantier branch, there is nothing we can deduce with certainty, since, with the exception of Alice Allard Duplan-tier, none of these Duplantiers can be established as being the same Duplantiers of which relator’s mother was issue on the maternal side. Either Alice Allard Duplan-tier Suane or her husband, Placide Suane, or both, could be colored by virtue of the presumption arising from their children’s certificates. They, of course were not in the direct ascending line of the relator. On the other hand, if the Louis Duplantier who died in 1889 be taken as Louise Duplantier Cousin’s father, his age would roughly correspond, and the City of New Orleans would correspond as to the geographical location.
The described certificate is the only document presented on Joseph Pat Cousin (“White”), the husband of Louise Duplan-tier; his parents are Wonnie Cousin, whose birthplace is listed as France, and Elizabeth Melon (no birth place); Joseph Pat died in Lacombe. Wonnie Cousin and Elizabeth Melon would seem to coincide with John “Wanee” Cousin and Elisa Millón stated in the plaintiff’s evidence. Likewise we have a death certificate “White” of Natelie (Cousin) Riviere, daughter of J. W. Cousin and Elizabeth Millen (listed as born in France) and a death certificate on James Cousin, son of Wonie Cousin and Elizabeth Melon (birthplace listed as Lacombe). James is marked “White” as a result of a Court order emanating from suit No. 366-674. James Cousin would be the brother of Joseph Pat Cousin and the paternal grandfather of the relator due to intermarriage within the Cousin family (which appears to have occurred twice in the line descending to relator). James and Natalie lived in Lacombe, Louisiana. There is also a delayed certificate of birth on Rock Cousin (s) who is James and “Cazelia” Cousin(s) son, and thus brother to Garland, relator’s ■father. The certificate has him as “White”. In addition to James’ certificate, there is a photostat of an alleged newspaper account of his death, wherein he is described as a “colored man”.
At this point we refer to some of the evidence filed in suit No. 366-674 by counsel for the relator. These are three death certificates of children of “John (Wonie) Cousin and Elizabeth Melon” (though there is variance in the spelling of the parents’ *493 names) besides James and Natalie and Joseph Pat Cousin. These are Elzara, Ros-amie, and Victoria Cousin, all recorded as “White”. The birthplace of the parents varies between France and Lacombe for their father, and Lacombe, Louisiana, or unknown for the mother. There was also filed in that record the marriage license of John W. Cousin and Eliza Mellon of the year 1886, which is after ;he birth of their children.
We then refer back- to the Board of Health’s evidence in this case to Ralph Cousin who was a son of Rosamie Cousin of Lacombe by an unknown father, according to a death certificate which has him as “Colored”.
Farther than this we cannot go, unless we resort to a Federal Census of 1880 taken in Lacombe, St. Tammany Parish. There is listed a John and Eliza Cousin (John is 71 years of age in 1880; Eliza is 35); John is white and Eliza a mulatto. Their children are listed as Rosemin, James, Stalie, Albertine, Victoria, Alsin, Mack and Joseph, designated as mulattoes. The ages of Rose-min, James, Stalie, Victoria, Alsin and Joseph given on the census would closely, though not exactly, correspond to the ages given on the death certificates of Rosamie, James, Natalie, Victoria, Elzara and Joseph Pat Cousin.
Another family listed on the census is that of Octave (“White”) and Delpine Cousin (“Mulatto”). Here then is an inconsistency in the evidence. Although the age of their child Casceila would be roughly compatible with the age of Cassilia, who, as discussed before, was recorded as marrying James Cousin, her father is Octave, but her mother is Cassilia, in the marriage record. The child Casceila is recorded as mulatto on the census. She also has a brother on the census, Morgan (mulatto). Offered in evidence were a certificate of death of Victoria Lagarde (Colored), widow of Morgan Cousin, and a birth certificate of May Cousin, child of Morgan and Victoria Cousin, which certificate classifies the parents as “Negro”. There would be roughly a difference of four years in the ages of Morgan on the census and Morgan of the certificate. There is finally a certificate of death on Octave Cousin(s) (“Negro”), son of Nelville and Odile Cousin of Lacombe. There is a Nelville on the census as Octave’s and Delpine’s child, which Nelville and Odile are not in the direct ascending line of the relator.
With the evidence as set forth above, we think the trial Court decided the case properly. This will appear from the law applicable to cases of this nature, which will be discussed in connection with the relator’s complaints of error.
The Federal Census records of 1880, taken in Lacombe, Louisiana were objected to and are argued to be inadmissable by the appellant. The trial judge admitted the records into evidence and we presume, arguendo, that he used them in reaching his determination. The basis urged for their in-admissability is the Federal Statute found at 13 U.S.C.A. Section 8, as amended in 1957, and Section 9 as amended in 1962. Section 8(c) reads:
“In no case shall information furnished under the authority of this section be used to the detriment of the persons to whom such information relates.”
Section 9(a) reads:
(a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—
(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or
(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or
(3) permit anyone other than the sworn officers and employees of the Department *494 or bureau or agency thereof to examine the individual reports.
“No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding. As amended Oct. 15, 1962, Pub.L. 87-813, 76 Stat. 922.”
However, the effect of this statutory law has been held not to extend to the use of a census report by the State Board of Health in defense of its own records. State ex rel. Lytell v. Louisiana State Board of Health, 153 So.2d 498 (La.App.1963) states:
“We find no Federal decision that such records cannot be used by a sovereign state in defense of its own vital statistics records, when the integrity of the latter is attacked by one claiming immunity under the Federal Statutes.
“Defendant obtained the census records from the public library which obtained them under 13 U.S.C.A. § 8(b). Recent decisions state that the prohibition against their use, under Sec. 9, is only against officials receiving such information, and does not generally' clothe them with secrecy. St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed. 2d 240.”
We fail to appreciate the relator’s argument that the census records are not being used in defense of the vital statistics records in this case, in view of the fact that the relator and several of her brothers and sisters are classified as “Colored” on the Board of Health records.
The next point presented is that the State Board of Health in using the census is attempting to attack collaterally the District Court judgments heretofore discussed. The cases cited by the relator for the proposition that judgments may not be collaterally attacked are not applicable, since this court has held that the mandamus proceeding in this type of case is strictly personal to the parties thereto and does not affect the rights of any other person not a party to the proceedings. State ex. rel. Encalade v. City of New Orleans, 188 So.2d 88 (La.App.1966).
The issue is presented of what weight we are to accord to the relator’s birth certificate and some of those of her siblings. It appears that the certificates were filled out by the local registrar and the name of “Theresa Tucker”, the midwife, was also filled in by him, as it was all done in the same handwriting. On the relator’s certificate there is a mark with what appears to be the words “her mark” by Theresa Tucker’s name. The question is, does this destroy the prima facie presumption of correctness afforded by R.S. 40:159, quoted below:
“Except for delayed or altered certificates, every original certificate on file in the division of public health statistics is prima facie evidence of the facts therein stated.”
if! * * * * *
Counsel for appellant states that the midwife’s mark should have been witnessed, and there has thus been a failure to comply with the law of R.S. 40:304:
“The birth certificate shall be prepared and filed by the physician, midwife, or other legally authorized person in attendance at the birth, or if not so attended, by one of the parents.
“If neither of the parents of the newborn child, unattended by either physician or midwife, is able to prepare a birth certificate, the local registrar shall secure the necessary information for its preparation *495 from any person having knowledge of the birth.”
There is nothing in this statute to indicate that witnesses are required to the mid-, wife’s mark, or that the registrar could not fill out the certificate when the midwife is apparently unable to write, upon her information. Incidentally, this statute was not enacted until 1942, which is after the date of relator’s original birth certificate.
This brings us to the final and crucial issue of the case. What is the burden of proof upon, and has it been sustained by, the relator ? Relator cites Sunseri v. Cassagne, 191 La. 209, 185 So. 1 as authority for the proposition that a person commonly accepted as a member of the white race should not be held to be of the colored race unless all of the evidence presented leaves no room for doubt. In addition, language from the case of State ex rel. Treadaway v. La. State Board of Health, 56 So.2d 249 (La.App.1953) is quoted:
“We interpret the language used in the Sunseri case and quoted above as indicating that the proof in such case should be even more convincing than that which is necessary in such cases as must be proved ‘beyond a reasonable doubt’. We feel that the language used by the Supreme Court means that there must be no doubt at all.”
We point out that the exact context of the Sunseri holding was the following:
“In our discussion of the evidence subr mitted by the respective parties, we have not considered the effect of the three certificates which were issued by the Recorder of Births and Marriages for the Parish of Orleans, reciting that Verna Cassagne, the defendant, is colored, and that her aunts, Camille Cusachs and Margo Marie Cusachs, and their respective husbands were married as members of the colored race. Apart from these certificates, the evidence, while persuasive, is not conclusive and does not warrant us in holding that defendant is a member of the colored race, particularly in view of the overwhelming testimony that she and her immediate associates have always been regarded as members of the white race and have associated with persons of that race. The recitals of the certificates are presumably correct and, if permitted to stand, will be decisive of the issues involved in this case.
“But the defendant strenuously insists that the recitals of the certificates are not correct and that they are not in accordance with the true facts. She declares that since the appeal was taken she has discovered certain evidence, which will establish the incorrectness of the records from which the certificates were taken, and she has filed an application to have the case remanded in order that she may have an opportunity of showing the incorrectness of the records and that the parties referred to therein should be designated as white instead of colored to conform to the true facts. We think that defendant should be given an opportunity to do this, since her marriage should not be annulled on the ground that she is a member of the negro race unless all the evidence adduced leaves no room for doubt that such is the case.”
The end result was that the party in question was held to be colored. 195 La. 19, 196 So. 7.
Although the Treadaway case did contain the language quoted therefrom, that case was subsequently heard by the Supreme Court at 221 La. 1048, 61 So.2d 735, 739, and the following was stated in connection with the relator’s mother’s certificate:
“Relator must show that he has a clear legal right to have the correction made. The legal certainty of the proof submitted must be such as to compel the Registrar of Vital Statistics to perform the ministerial duty of changing the recordation from “Colored” to “White”. The proof of record falls far short of any such assumption. As the name indicates, the records kept by the Registrar are vital to *496 the general public welfare. The registration of a birthright must be given as much sanctity in the law as the registration of a property right.”
In addition the more recent case of State ex rel. Cousin v. Louisiana State Board of Health, 138 So.2d 829 (La.App.1962) contains the statement:
“ * * * we think the burden clearly rests upon the relator of showing beyond any doubt at all that he is entitled to a certificate showing that he belongs to the white race. * * ”
where he was seeking to have his registration changed. Certiorari was granted by the Louisiana Supreme Court, but the case was not decided by them, the relator having died, rendering the issues moot. 243 La. 774, 147 So.2d 211. However, the rule was followed in State ex rel. Francis v. Louisiana State Board of Health, et al. 179 So.2d 681 (La.App.1965). In that case the Court was faced with the situation where, as here, the records were in a confused state, and the Court applied the above rule of law:
“In applying the foregoing rationale to the facts of this case we are led to the inevitable conclusion that there exists no justification for ordering a change in the plaintiff’s birth certificate in order to designate him as Negro instead of Indian. It is true that a portion of the evidence inscribed in the record tends to indicate that several of the plaintiff’s ancestors were of the Negro race. However, the confusion and contradiction appearing on the very face of the documents, as we have pointed out herein-above, makes the conclusion self-evident that some of these records are obviously incorrect. Once we acknowledge, as we must, the incorrectness of this aspect of these records, it becomes quite obvious that we cannot order a change in the plaintiff’s racial designation, since we are unable to discern which of these records are incorrect and which are not; therefore, the initial question posed for our consideration is not susceptible of a positive answer in conformity with the requirement of the existing law.
“The plaintiff’s present birth registration reveals that he is an Indian. Far from leaving no doubt of their correctness, the records produced as evidence of the plaintiff’s racial lineage reflect nothing concrete. Therefore, since the evidence adduced herein leaves us “ ‘doubtful’, the plaintiff’s birth registration must remain as it is, and the defendant must accordingly issue plaintiff’s birth certificate with the racial designation appearing therein of Indian.”
This being our appreciation of the present status of the law, the relator has not established her right to be registered as “White” beyond any doubt, and we think not even beyond a reasonable doubt; the Judgment is affirmed.
Affirmed.